129 N.J. Super. 486 (1974)
324 A.2d 90
IN THE MATTER OF J.S. & C.
Superior Court of New Jersey, Chancery Division.
Decided July 26, 1974.
*487 Mr. Richard L. Amster for plaintiff.
Mr. Seymour Wishman for Defendant and Ms. Marilyn Haft for the American Civil Liberties Union.
LUCCHI, J.D.C., Temporarily Assigned.
The controversy presented to the court by this case concerns the extent of visitation rights of a divorced parent who is homosexual. On July 27, 1971 a pendente lite order was entered granting custody of the three children of the marriage to the mother. The father was granted certain rights of visitation, including a three-week summer vacation, alternate three-day holidays, a week during Easter and Christmas and alternate weekends of the year.
*488 A judgment of divorce was entered March 21, 1973 in favor of the wife without contest, on grounds of extreme cruelty. The judgment directed that custody of the three children be retained by the mother. At that time, as the result of the involved conflict over the extent of the father's visitation, the court ordered that a separate hearing on this matter would be conducted at a later date. In preparation for the hearing it was ordered that a Probation Department investigation and report would be conducted, along with an examination of the children by a mutually agreed upon psychiatrist. It was further ordered that, pending the receipt of the Probation Department and psychiatrist's reports, the father should continue to have the right of visitation, including overnight with the younger two children on every weekend. Visitation with the oldest child was limited to Sundays every other weekend, and overnight visits were eliminated until further order of the court. The father was additionally restricted from having any male overnight guests other than members of his lawful family when the younger two children stayed overnight, and he was ordered not to permit any of his children to be exposed to or take part in any activities or publicity concerning the homosexual civil rights movement.
Plaintiff mother seeks to limit visitation rights so as to exclude overnight stays with the father. The basis for her request is the belief that the homosexual environment to which the father exposes the children is deleterious and not in their best interest. The father contends the Constitution prohibits restriction of parental rights on the basis of homosexuality. In addition, he offered expert testimony to rebut allegations of the mother that exposure to a homosexual parent or the parent's homosexual friends and their way of life is detrimental to children generally and his children specifically.
More than six days of testimony was heard from expert and fact witnesses. I make the following findings of fact necessary to decide this case: The mother and father were married in 1960. Three minor children, two boys and a girl, were born of the marriage. The parents separated around the *489 time of the pendente lite order in July of 1971. The father is an avowed and publicly known homosexual. He associates with other homosexuals and is presently living with a homosexual lover. During the visits with the father, the children associate with the father's homosexual lover and acquaintances.
The central issues presented in this case are:
(1) Whether the parental rights of visitation should be restricted on the basis that the father is a homosexual;
(2) Whether the granting of visitation rights to this homosexual father will serve the best interest of the children, and
(3) Whether the visitation rights of his homosexual father should be restricted.
The parental rights of a homosexual, like those of a heterosexual, are constitutionally protected. Fundamental rights of parents may not be denied, limited or restricted on the basis of sexual orientation, per se. The right of a parent, including a homosexual parent, to the companionship and care of his or her child, insofar as it is for the best interest of the child is a fundamental right protected by the First, Ninth and Fourteenth Amendments to the United States Constitution. That right may not be restricted without a showing that the parent's activities may tend to impair the emotional or physical health of the child. As stated In re N, 96 N.J. Super. 415 (App. Div. 1967):
The right of a natural parent to its child must be included with the bundle of rights associated with marriage, establishing a home and rearing children; as such, it should be viewed as "so rooted in the tradition and conscience of our people as to be ranked as fundamental." Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674, 677, 90 A.L.R. 575, 579 (1934), approvingly quoted in Griswold v. Commonwealth of Connecticut, 381 U.S. 479, 487, 85 S.Ct. 1678, 14 L.Ed.2d 510, 517 (1965) (Goldberg, J. concurring). Note also Id., 381 U.S., at pp. 495-496, 85 S.Ct. at pp. 1687-1688, 14 L.Ed.2d, at p. 522. The Fourteenth Amendment's concept of substantive due process protects the parent-child relationship from unwarranted governmental intrusion. See Meyer v. State of Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042, 1045 *490 (1923); Pierce v. Society of the Sisters, 268 U.S. 510, 534-535, 45 S.Ct. 571, 69 L.Ed. 1070, 1078 (1925); Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645, 652, rehearing denied 321 U.S. 804, 64 S.Ct. 784, 88 L.Ed. 1090 (1944); Lacher v. Venus, 177 Wis. 558, 188 N.W. 613, 617, 24 A.L.R. 403, 408-410 (Sup. Ct. 1922). The Amendment is also construed to protect the right of a natural parent to procedural due process when the custody or adoption of its child is being litigated. See May v. Anderson, 345 U.S. 528, 533-534, 73 S.Ct. 840, 97 L.Ed. 1221, 1226-1227 (1953); Armstrong v. Manzo, 380 U.S. 545, 550-551, 85 S.Ct. 1187, 14 L.Ed.2d 62, 66 (1965).
In 1923 the Supreme Court, in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 cited supra, upheld the right of parents to have their children taught the German language. Although the court observed that the liberty guaranteed by the Fourteenth Amendment had never been defined with exactness, it determined that "[w]ithout doubt, it denotes * * * the right of the individual * * * to marry, establish a home and bring up children." (At 399, 43 S.Ct. at 626).
In Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), the court invalidated a state statute providing for the sterilization of habitual criminals and emphasized the fundamental nature of the constitutionally protected rights to marry and to procreate. In May v. Anderson, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221, cited supra, the court denied full faith and credit to an ex parte Wisconsin custody decree and held that a parent's "immediate right to the care, custody, management and companionship of * * * minor children" is one of the most precious of personal liberties. (At 533, 73 S.Ct. at 843). And in Griswold v. Connecticut, 381 U.S. 479, 85 S. Ct 1678, 14 L.Ed.2d 510, cited supra, the court, invalidating a statute which criminalized the use of contraceptives by married couples, reaffirmed that the sanctity of a man's home and the privacies of life is a right so fundamental that it is safeguarded both by the right of privacy inherent in the First Amendment and by the Ninth Amendment to the United States Constitution. *491 (At 487, 85 S.Ct. at 1678). See also, Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).
More recently, the Supreme Court has explained the scope and nature of family freedoms with greater elaboration. In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 208, 31 L.Ed.2d 551 (1972), the court declared unconstitutional Illinois' dependency and neglect statute which deprived unmarried fathers of the care and custody of their natural children on the death of the mother:
The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," "basic civil rights of man," and "rights far more precious than property rights." It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment. [at 651, 92 S.Ct. at 1212; citations omitted]
In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the court analyzed the protection afforded parental rights by the emerging constitutional right of privacy. Past decisions, the court notes,
* * * make it clear that only personal rights that can be deemed `fundamental' or `implicit in the concept of ordered liberty,' are included in this guarantee of personal privacy. They also made it clear that the right has some extension to activities relating to marriage, procreation, contraception, family relationships, and child rearing and education. [at 152, 93 S.Ct. at 726; citations omitted]
Restriction of full contact between a father and child interferes with family relationships and impedes the father's right to participate in his children's rearing and education.
The courts of New Jersey have expressed a policy encouraging protection of family relationships by favoring full visitation rights in order "to insure that [the children] shall not only retain the love of both parents but shall at all times and constantly be `deeply imbued with love and respect for both *492 parents.'" Smith v. Smith, 85 N.J. Super. 462, 469 (J.D.R. Ct. 1964); Jackson v. Jackson, 13 N.J. Super. 144 (App. Div. 1951).
The court thus concludes that the fact that one of the parents is a homosexual does not per se provide sufficient basis for a deprivation of visitation rights.
Although a deprivation of the parent's visitation rights due solely to homosexuality would be unjustified discrimination, this fact does not prevent or relieve a court from the duty of closely examining any claim where it is alleged that exposure to a specific homosexual parent may have a detrimental effect on a child.
Three expert witnesses, Dr. John Money and Dr. Richard Green for defendant, and Dr. Richard Gardner for plaintiff, all recognized authorities in their fields, testified in the areas of child psychiatry, sexual development and homosexuality.
The first question broached by these experts was whether exposure to the father's homosexuality might be deleterious to the children. They all agreed that homosexuality was not per se a mental disorder and that a balanced exposure would not be harmful to the children. All concluded that the children have a close, loving and respectful relationship with their father. Dr. Gardner stated, "I am strongly advising that there be visitation. I feel that it would be very detrimental to both him and his children were there not to be visitation." They agreed that the father had been a good parent. Dr. Gardner stated, "The fact that they were so healthy indicated that he [the father] was providing a healthy atmosphere for them and had done so at least in the past to provide them with a stable personality."
In my interview with the children I found them to be well adjusted and anxious to continue their relationship with their father. I conclude that granting visitation rights to the father will serve the best interests of the children.
A second and more difficult problem concerns the court. Whether the defendant father's visitation rights should be restricted and if so to what extent.
*493 The defendant father has cited Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), in support of his position that the parent-child relationship is primary to the State's view of the child's welfare and the exercise of its parens patriae authority. He contends that as a parent his right to raise his children in a particular manner may not be limited by the State in the absence of a demonstration that the parent had impaired the safety or physical or mental health of the children. Yoder involves a conflict between the free exercise of religion by the Amish and a state requirement that all children attend at least one year of secondary education. The Supreme Court's decision was based on the parents' rights to the free exercise of religion combined with their right to control the religious upbringing of their children and the absence of any evidence that the exercise of such freedom would result in detriment "[to] the welfare of the child and society as a whole" (emphasis added). In addition the court stated, "the power of the parent, even when linked to a free exercise [of religion] claim, may be subject to limitation * * * if it appears that parental decisions will jeopardize the health or safety of the child." This decision clearly recognizes that a parent's right to raise his child as he sees fit is secondary to the State's power to ensure the health and welfare of the child.
Although parents possess various rights such as custody and visitation these rights will fall in the face of evidence that their exercise will result in emotional or physical harm to a child or will be detrimental to the child's welfare.
The decisional law of this State, insofar as the custody and visitation of infants are concerned, supports without exception the proposition that the paramount consideration of the courts is for the "safety, happiness, physical, mental and moral welfare of the child." Fantony v. Fantony, 21 N.J. 525, 536 (1956); In Re Mrs. M., 74 N.J. Super. 178, 183 (App. Div. 1962); cf. N.J.S.A. 9:2-4. The leading case in the State touching upon visitation and overnight custody rights is Fiore v. Fiore, 49 N.J. Super. 219 (App. Div. *494 1958); certif. den. 28 N.J. 59 (1958). The lower court in that case ordered an abatement of support because the mother was interfering with the rights of the father to visitation and overnight custody. In reversing the lower court's order, the court held:
The welfare of the child is the primary, paramount and controlling consideration in determining the question of visitation and custody of a minor child. The legal rights and claims of either parent and the wishes and personal desires of said parent must yield, if opposed to what the court, in the discharge of its duty, regards the welfare of the child to be.
It is clear that the court may impose a limitation of defendant's visitation rights if it determines that it will serve the best interest of the children.
The mother's request for a severe limitation of defendant's visitation rights is based on her position that defendant's total involvement with and dedication to furthering homosexuality has created an environment exposure to which in anything more than a minimal amount would be harmful to the children.
The extent of defendant's involvement in homosexuality, homosexuals and with various movements furthering the cause of homosexuality is uncontradicted. He has been a leader of the Gay Activists Alliance and is currently employed as a Director of the National Gay Task Force at a net salary of $89.78 a week. In the past defendant has earned a substantial income which was utilized to help support the children. He has now decided to forego this income in favor of the gay rights movement.
Since his separation from plaintiff, defendant has had several homosexual lovers. He presently lives with a male lover in a building occupied almost entirely by homosexuals. A business undertaking in which he is currently involved is owned primarily by homosexuals.
Defendant has involved the children in his attempts to further homosexuality. They have accompanied him on protest *495 marches, at rallies and were filmed with him for a television show which discussed homosexuality. They have been present with him at "The Firehouse", a meeting hall for homosexuals, where one witness has testified he observed men, "fondling each other, necking and petting." They have slept overnight at defendant's apartment while he slept with a male lover. The evidence and testimony also indicates that pornographic periodicals with a homosexual orientation are available to the children at defendant's residence. Both my interview with the children and the testimony at the hearing indicated that homosexuality and gay rights are a common if not the most common topic of conversation when the children are with defendant.
The extent of the influence of the father over S and C was made evident to the court by children's drawings offered by defendant as exhibits D12a and b and c. D12a portrays a figure holding two signs which say, "Gay is proud" and "Join us ! ! !" D12c portrays a dog dressed to resemble a policeman stating, "Hey you, get out of here," to figures holding signs which say, "We want equal rights ! !" These pictures present themes which would not occur to children of this age without prodding and indoctrination by an adult.
My interview with S, an 11-year-old girl, and C, an 8-year-old boy, elicited no aversion on their part to visiting with defendant. Neither appeared disturbed by their father's activities; however, they expressed their wishes not to be involved in the gay movement. They did not have a grasp of what homosexuality or gay rights involved and were chiefly interested in continuing to enjoy their father's company. J, a 12-year-old boy, stated that he is unhappy when his father is with a male friend and he does not wish to stay overnight. He also indicated that he does not want to participate in gay activities.
Although the experts agreed there was very little chance that exposure to a homosexual environment would alter the children's sexual orientation and at the present time they are well adjusted, Dr. Gardner indicated that the milieu *496 that produced three healthy children was the milieu that existed prior to the separation. He was convinced that defendant's involvement in the gay movement had become an obsessive preoccupation and that the children's exposure to the concentrated and unidirectional environment this produced should be limited.
Dr. Gardner stated: "I believe he [defendant] is different with regard to the amount of activity that he is involved in, that it goes beyond the bedroom, that his political activities appear to be a significant involvement in his life which go way above and beyond the actual homosexual involvement." Dr. Gardner did not feel that defendant's preoccupation was "realistically changeable" and that controls had to be structured, "so that in any area that you can physically and in a concrete way remove exposure to any potential homosexual experience, that will be good preventive psychiatry as I see it." He felt strongly that there should be visitation but that there should be a change in those things in the environment "that can lessen the exposure to homosexuality."
Additionally, Dr. Gardner stated, "the total environment to which the father exposed the children could impede healthy sexual development in the future." Specifically, he contended that, "the father's milieu could engender homosexual fantasies causing confusion and anxiety which would in turn affect the children's sexual development." He asserted, "it is possible that these children upon reaching puberty would be subject to either overt or covert homosexual seduction which would detrimentally influence their sexual development."
In response to a question concerning the limitations on visitation which should be imposed Dr. Gardner replied, "my recommendation would be that there not be any overnight visitation for any of the three children, both weekends and during summers."
Dr. Money and Dr. Green do not concur with Dr. Gardner's conclusion regarding the possible ill effects on the *497 children which continued unlimited exposure to the homosexually oriented milieu in which defendant has submerged himself might cause. Nevertheless, it is clear to the court from the overall tenor of the testimony from all three experts that any pronouncements by them in this area must contain a relatively high percentage of speculation. As recently as December 1973, when the Board of Trustees of the American Psychiatric Association reclassified homosexuality from a mental disorder to a sexual disorientation, they were met with strong opposition from among the members. The inability of psychiatrists to reach any degree of unanimity even as to a basic definition or classification of homosexuality is strong evidence of the diverse and myriad analyses which would erupt were the controversy presently before this court presented to the Association.
The lack of understanding and controversy which surrounds homosexuality, together with the immutable effects which are engendered by the parent-child relationship, demands that the court be most hesitant in allowing any unnecessary exposure of a child to an environment which may be deleterious.
Defendant has asserted that addicts and people convicted of violent crimes do not lose their visitation rights unless there is a showing that the parent will physically harm the children or not provide for them. He requests that at least the same standards be applied to him. I agree that the same standards should be applied to defendant in determining the extent of visitation but the factors which enter into consideration must be more inclusive than the threat of mere physical harm. We are dealing in the present case with a most sensitive issue which holds the possibility of inflicting severe mental anguish and detriment on three innocent children. All the efforts of this court are directed toward preventing this from occurring.
Where a bank robber is allowed full visitation rights, as defendant has hypothesized, surely the exercise of these rights whether expressed or implicit is restricted to exclude *498 his exposing the child to any aspects of this most unacceptible line of endeavor. Similarly, a homosexual who openly advocates violations of the New Jersey statutes forbidding sodomy, N.J.S.A. 2A:143-1 and related statutes, may also be restricted.
Based on the testimony given, the evidence received and my interviews with J, S and C, I conclude that allowing defendant to continue unrestricted visitation would not be in the best interest of the children and that a reasonable limitation will not in any way hinder the continuance and furtherance of the sound parent-child relationships which exist between defendant and J, S and C.
In accordance with the above I direct that defendant be afforded visitation with J, S and C on alternate Sundays from 10 A.M. to 7 P.M., on Christmas, Easter and Thanksgiving from 3 P.M. to 7 P.M., and three weeks during the summer at an address other than his present Spring Street residence.
During such periods of visitation the defendant shall:
1) not cohabit or sleep with any individual other than a lawful spouse,
2) not take the children or allow them to be taken to "The Firehouse," and
3) not involve the children in any homosexual related activities or publicity.
4) not be in the presence of his lover.