145 N.J. Super. 120 (1976)
366 A.2d 1350
MARIE DeVITA, PLAINTIFF-RESPONDENT,
v.
MICHAEL DeVITA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 14, 1976.
Decided November 19, 1976.
*122 Before Judges LYNCH, MILMED and ANTELL.
Mr. Leo B. Mazer argued the cause for appellant (Messrs. Mazer & Lesemann, attorneys, Mr. Joseph F. Pandolfi on the brief).
Mr. George A. Browne argued the cause for respondent (Messrs. Browne, Buckalew & DeMarrais, attorneys).
The opinion of the court was delivered by LYNCH, P.J.A.D.
On appeal defendant challenges two provisions of the judgment of divorce between the parties. First he contends that the trial judge erred in the monetary arrangements it made for the children. Defendant maintains that a support order for $350 a week for seven infant children and an order to pay $100 a week into an educational trust fund are improper. Secondly, he argues that the court's order that he not have a female companion staying overnight *123 in his home when the children of the marriage are visiting him on alternate weekends is arbitrary and constitutes an impingement upon his constitutional right to privacy.
An award of support is within the discretion of the trial judge. Jacobs v. Jacobs, 109 N.J. Super. 287, 297 (App. Div. 1970). It will not be disturbed unless it is manifestly unreasonable, arbitrary or clearly contrary to reason or to the evidence, or the result of whim or caprice. We have examined the proofs with respect to the financial capacity of the parties and we conclude that the award of support, as well as the requirement that $100 a week be contributed to an educational fund are amply supported by the record.
We also conclude that the restriction on defendant's weekend visitations with his children (that his female companion may not spend the night when his children do) was an exercise of discretion and not an abuse thereof. In our review of an issue of custody the conclusions of a trial judge are entitled to great weight and will not be lightly disturbed on appeal. Sheehan v. Sheehan, 51 N.J. Super. 276, 295 (App. Div. 1951). See also Schwartz v. Schwartz, 68 N.J. Super. 223 (App. Div. 1961).
The proofs indicate that defendant has a female friend who, on two occasions at least, has taken weekend trips with defendant, the children of this marriage and her own children. It is true that on those occasions the evidence indicates that both appellant and his companion slept in separate bedrooms with their respective children. There is no evidence that there has been any harmful psychological effect upon the children of the marriage by reason of the frequent presence of the female friend in defendant's household. However, there was testimony that there is at times discord between the defendant's children and those of his companion.
In support of his contention that the imposition of this restriction on his rights of visitation constitutes an impingement on his constitutional right to privacy, defendant cites Feldman v. Feldman, 45 A.D.2d 320, 358 N.Y.S.2d *124 507 (App. Div. 1974), and CC v. CC, 37 A.D.2d 657, 322 N.Y.S.2d 388 (App. Div. 1971).
The cited cases are inapposite. They did not involve mere conditions attached to rights of visitation as here. Rather, each involved the more traumatic issue as to whether the mother was to be deprived of custody of the children because of asserted sexual aberrations on her part. When dealing with custody the burden of proof required to show that a mother is guilty of gross sexual misconduct to the detriment of her children is a heavy one. In Feldman and CC v. CC, there was no showing that the mothers' activities adversely affected the welfare of the children; therefore, it was held that the mothers were not so "unfit" as to deprive them of the custody of the children.
It is true that in Feldman Justice Benjamin asserted that the right of a divorced woman to engage in private sexual activities "is within the penumbra of that yet ill-defined area of privacy mandated by the specific guarantees of the Bill of Rights (cf. Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510)." 358 N.Y.S.2d at 511. But this extension of Griswold is questionable. Griswold, holding that a statute which made the use of contraceptives a criminal offense was an unconstitutional invasion of the right of privacy of married persons, can hardly be said to be relevant to a custody case in which the welfare of the children is paramount. See In re B, 85 Misc.2d 515, 380 N.Y.S.2d 848, 857 (Sup. Ct. 1976). Additionally, Judge Christ whose concurrence provided the third vote in the majority of Feldman (the decision was 3 to 2 with three separate majority opinions) did not base his concurrence on any issue of the mother's right to privacy. He said simply: "I do not condone the mother's conduct and believe it to be contrary to good morals. However, the question before us is deeper than this. It is to determine where the children will be best located." And because of "the uncertainty of the accommodations provided by the father" he would not approve the *125 transfer of custody from the mother to the father. 358 N.Y.S. 2d at 518. In CC v. CC there was no reference to the right to privacy which is here asserted by the father.
We are concerned here solely with a condition attached to visitation rights of the father. More analogous to this issue than Feldman and CC v. CC, are the decisions in People ex rel. Repetti v. Repetti, 50 A.D.2d 913, 377 N.Y.S.2d 571 (App. Div. 1975); Fulwiler v. Fulwiler, 538 P.2d 958 (Ore. App. 1975); In re B, supra.
In Repetti the court (also by a vote of 3 to 2) held (377 N.Y.S.2d at 573) that the children's visitation to the father's home from 9 A.M. to 9 P.M. on Saturday and Sunday should not be conditioned upon the absence of "another woman to whom [the father] is not related." In the instant case the judge has also not forbidden the presence of defendant's female companion when the children are visiting during the daytime. But it is certainly not unreasonable to see different implications when the woman remains overnight in the father's home in the presence of the children. That is the situation here and it is a more than satisfactory distinction on which to base the restriction.
Fulwiler v. Fulwiler, supra, is pertinent although it lacks exposition of its reasoning. The decision upheld a condition attached to the father's right of visitation which would prohibit him from taking his five year old son "to or with the woman he lives with now unless or until they are married." 538 P.2d at 960.
Of greater significance to defendant's contentions concerning the violation of his alleged constitutional right of privacy is the opinion in In re B, supra. In that case the court ordered that the custody of a ten-year-old child be changed from the mother to the father. It is true that there was specific proof of the mother's aberrant sexual activities (she was a lesbian) and there was some evidence that the child was emotionally insecure. Concededly there is no such evidence in this case. Nevertheless, the mother there, as the father here, contended that her constitutional rights of freedom *126 of speech and actions and her right to live her own life style were involved. The court in In re J B, said:
The issue here, however, is not homosexuality, it is solely the best interest and welfare of the child that the Court must consider under the existing circumstances of the case. The cases cited go to "fundamental personal rights" and "right of privacy". The Court here is not abridging respondent's fundamental rights or privacy but concerns itself solely with the wellbeing of the child and the questions as to whether the present environment is a proper one for this child and in her best interest.
Harper v. Virginia Board of Education, 383 U.S. 663, 86 S.C. 1079, 16 L.Ed.2d 169; McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222; Karamatsu v. U.S., 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194; discuss government interference with fundamental rights only where (1) there is a compelling governmental interest and (2) governmental intervention is "necessary." These cases are not in point insofar as the problem posed in this instant case. [380 N.Y.S.2d at 857]
The court distinguished the quoted cases because they only dealt with personal rights that did not affect third parties.
The court further stated:
This is not a matter of constitutional rights of respondent or Lucy Q. to be homosexuals or a violation of their freedom of choice of actions. The fundamental question is whether, in the sound discretion of the Court, this type of living environment is detrimental to the welfare of the child and in her best interest.

* * * * * * * *
The issue before this Court is not freedom of speech, freedom of action or other constitutional rights of the respondent or Lucy Q. with whom she admittedly cohabits in a lesbian relationship in the apartment where the infant child, Jane B., lives. The mode of life chosen by respondent and Lucy Q. per se is not the concern of the Court. However, the presence of the ten year old child, Jane B., living in this environment is the concern of this Court, since the welfare and best interest of the child, whose future is at stake in this custody dispute between the parents, is the sole and ultimate responsibility of the Court. [Id. at 859]
More to the point, the court concluded:
Lucy Q. and respondent can live as they will as two consenting adults. However, the child's interest is the responsibility of this Court delegated *127 by statute in the nature of guardianship which takes precedence over the mother's right of custody where the child's emotional health, welfare, and best interests are concerned. [2d. at 860].
And:
In determining the question of custody, the Court must be guided by provisions of Section 70 D.R.L. that there is no prima facie right to custody of a child in either parent, but that the Court shall determine solely what is in the best interests of the child and what will best promote its welfare and happiness. This is the true test to be applied rather than any claimed constitutional rights of the mother to live her own life style. This is her prerogative, but it must yield to the best interest and welfare of the infant child. [Id.]
The court allowed the mother to have reasonable visitation rights but imposed as one of the conditions:
That the child, Jane B., will not remain overnight at respondent's residence nor is she to be taken there to visit while Lucy Q. or other homosexuals are present * * *. [Id.]
In In re J.B., the court also cited the case of In re J.S. & C., 129 N.J. Super. 486 (Ch. Div. 1974), written by the same judge who heard the instant matter at the trial level. There it was held that a homosexual father's visitation rights with his children would be restricted to the daytime hours.
We emphasize that there is no proof here of such gross sexual behavior on defendant's part as was shown in In re J.B., and In re J.S. & C. But the holding in the former case controverts defendant's proposition that the limitation on his weekend right of visitation impinges on his constitutional rights. And In re J.S. & C. demonstrates that, in the interest of the children's welfare, courts may limit the right of visitation.
The paramount consideration in custody and visitation cases is for the "safety, happiness, physical, mental and moral welfare of the child." Fantony v. Fantony, 21 N.J. 525, 536 (1956). In passing on an issue of custody the court is exercising its inherent equitable jurisdiction in its capacity *128 as parens patriae. Clemens v. Clemens, 20 N.J. Super. 383, 389 (App. Div. 1952); In re Erving, 109 N.J. Eq. 294, 297 (Ch. Div. 1931); 4 Pomeroy, Equity Jurisprudence (5th ed. 1941), §§ 1303 at 869 et seq. It follows that the equities are to be considered in our exercise of that function.
We recognize that the personal wishes of a parent do not govern the conditions of custody. Nevertheless, their respective concerns are to be considered, provided they relate to the paramount consideration of the safety, happiness, physical, mental and moral welfare of the child.
Here the mother apprehends that the moral welfare of her children may be endangered by the presence overnight of a female friend in the father's household and that such exposure is not conducive to that moral welfare. The father correctly contends that there is no evidence in this regard of any improper action between him and his female friend.
It is not for this court to determine what is moral or immoral in this context. Nor do we do so. We merely recognize that in the mother's view the moral welfare of the children is possibly endangered if the trial judge's restriction is not upheld. We do not decide whether the mother's views are correct or incorrect but she has a rightful interest in the moral welfare of the children which is entitled to respect. Further it must be acknowledged that her views are not contrary to those of a substantial body of the community. We cannot say that her apprehension that the moral welfare of the children is threatened is arbitrary. While we also recognize the viewpoint of defendant father, it is evident that there is no possibility of any harm to the moral welfare of the children if the order prohibiting the presence of the female friend overnight is affirmed. Even though there is no present evidence of sexual activity on the part of the father and his female friend in his household we cannot gainsay the possibility thereof in the circumstances present.
In balancing the equities we consider that there is no great inconvenience to the father in precluding his female friend from staying overnight on every other weekend when the children *129 are present in the house. If he wants the children on those weekends he can give up his wish to have his friend stay there. Since he disclaims any intent to have sexual relations with his friend, he cannot claim that he is deprived of that right, if it be such, by the condition in the order. In short, in the exercise of our equitable jurisdiction we conclude that the equities, in recognition of a possible impact on the children's moral welfare, dictate affirmance of the order appealed from. As Pomeroy says, on an issue of custody there is one "fundamental rule" viz. that it depends on the sound and enlightened discretion of the court. Pomeroy, op. cit., § 1307, n. 5 at 875.
We find no abuse of discretion by the trial judge in imposing the condition upon the father's visitation rights at his home which was imposed here. The order to that effect is affirmed as well as that portion of the order relating to support payments and the educational trust fund.
ANTELL, J.A.D. (dissenting).
I dissent from that part of the opinion which affirms the restriction on visitation.
The condition imposed is that defendant's woman friend may not remain overnight with defendant when the children are visiting. If there are no reasons for this the requirement is arbitrary and should not be sustained. The majority's decision to affirm this judgment is rested only on (1) "the mother's view [that] the moral welfare of the children is possibly endangered if the trial judge's restriction is not upheld," and (2) the fact that "her views are not contrary to those of a substantial body of the community."
Notwithstanding its abstention from expressly deciding "what is moral or immoral in this context," its unusual determination to insure these children a completely sanitary moral environment leaves little doubt as to what the majority's preferences are. Thus, it reasons that at least by following the course of action taken below "there is no possibility of any harm to the moral welfare of the children." The threat which awakens the court's protective instincts, evidently, *130 is the "possibility" of "sexual activity on the part of the father and his female friend in his household."
The majority concedes there is no evidence of any psychological harm to the children resulting from this arrangement. But it could have gone farther and acknowledged that this action is taken without any evidence whatever concerning harm of any kind to the children, psychological, emotional or moral.
My dissent from the decision of the court is made necessary by what I believe to be its faulty application of a basic principle: in matters of custody and visitation "the welfare of the child is the primary, paramount and controlling consideration," and the "legal rights and claims of either parent and the wishes and personal desires" of the parent are secondary. Fiore v. Fiore, 49 N.J. Super. 219, 225, 228 (App. Div. 1958). The interest which visitation fosters lies in preserving the child's relationship with the noncustodian parent. It is provided as a means of "`insuring that the children shall not only retain the love of both parents, but shall be at all times and constantly deeply imbued with love and respect for both parents.'" Turney v. Nooney, 5 N.J. Super. 392, 397 (App. Div. 1949); Salmon v. Salmon, 88 N.J. Super. 291, 309 (App. Div. 1965). By using visitation to make the father toe the line in respects which are not properly any of our concern, the court has lost sight of its first obligation to "strain every effort to attain for the child the affection of both parents rather than one." Turney v. Nooney, supra at 397. All that is accomplished is to deprive the children of the broadest and most liberal rights of visitation to which they are entitled.
The parties to this action are practicing physicians. Their children now range in age from 8 to 20 years, and nothing appears of record to suggest that either is less qualified than the other for the court to decide what is best for the mental, physical and moral well-being of the youngsters. Their marriage was dissolved by judgment dated February 25, 1975, although they have lived separate and apart since December *131 1972. At some uncertain time after they separated defendant met a woman (the "female companion"), a mother of two children herself, with whom he has maintained a relationship now estimated as of about three years duration. Although we lack details, we are told that they maintain separate dwellings and take trips and spend weekends together. Marriage is not now being considered, but they regard themselves as having formed a nonceremonialized family unit consisting of themselves and their respective children. No direct evidence has been presented on the point, but I would assume that there is a sexual component to the relationship, and I share the majority's unwillingness to guarantee that it would not privately be given expression even when they and their children are under the same roof.
However one may care to judge the correctness of defendant's conduct, it is a mistake to allow the mother's wishes to dominate our judgment. I say this even though they are probably supported, as the majority notes, by the weight of current popular sentiment. Standards of conduct change, and the issue presented in these settings is more often a matter of pragmatics rather than morality. We must therefore defer the use of our personal values, predominant though they are, as criteria by which to judge whether the conduct of others is or is not "moral." Today's innovations have a way of becoming tomorrow's conventional wisdom, and, whether we like it or not, signs exist that the particular orthodoxy being forced upon this defendant may be starting to lose ground. Our analysis of available figures, for example, based upon a 5% sampling of the population, indicates that cases of unmarried couples living together in this country rose from 22,307 in 1960 to 139,608 in 1970, an increase of 625%. U.S. Census Final Report PC(2)-4b, Persons by Family Characteristics: 1960, Table 15 (Persons in Households with Primary Individual as Head); 1970, Table 11 (Unrelated Persons Sharing Living Quarters).
Although we are not favored with a rational exposition as to what is meant by the children's "moral welfare," it seems *132 to me that the mother's concern that it will be impaired if the visitations are conducted under the circumstances described is derived from nothing more than her assumptions. The evidence is that the man and the woman sleep apart on these occasions, but even if they do share sleeping quarters separated from the children's, it is conjectural to say what effect this will have on the children or, more to the point, what difference it will make to them whether the adults are married or unmarried. Predicting the development of a child being raised in this disturbed kind of situation is an extremely uncertain thing. See Watson, "The Children of Armageddon: Problems of Custody Following Divorce, 21 Syracuse L. Rev. 66, 73 (1969-70); Goldstein, Freud & Solnit, Beyond the Best Interests of the Child, 50 (1973). This weakness in our knowledge of inter-personal reactions may well account for the reluctance of the courts to interfere with the parent-child relationship.
Except for Fulwiler v. Fulwiler, 538 P.2d 958 (Or. App. 1975), where the critical factual findings were not recited, the precedents cited by the majority expressly bottomed the visitation conditions on clear findings that the children were being hurt. In In re B., 85 Misc.2d 515, 380 N.Y.S.2d 848 (Sup. Ct. 1976), the court gave credence to psychiatric testimony that the child was emotionally insecure and that the homosexual atmosphere in which the mother lived would be harmful to her. And in In re J.S. & C., 129 N.J. Super. 486 (Ch. Div. 1974), it was only after the court had taken into account the desires of the children and heard the opinions of medical experts, and carefully considered the openly homosexual milieu in which the father lived and to which he regularly exposed the children, that it concluded a positive detriment to the children inhered in continuing unrestricted visitation. On this basis the judge signed an order prohibiting the father from cohabiting "with any individual other than a lawful spouse" during visitation. These treatments of the problem materially contrast to the one before *133 us which gives no explanation how the arrangement considered harms the children.
It is fair also to ask what would happen if plaintiff mother should modify her firmly held views and herself enter into a similar nonmarital relationship. Would the court thereupon vacate this restriction imposed upon the defendant? If so, I think this would be a whimsical reason for the court to depart from a policy supposedly formulated in the best interests of the children. But the alternative might create even more problems, since if the court were then to impose a like restriction upon the mother, the children would be left without a parent with whom to spend their night-time hours.
But my most serious objection is addressed to the potential for positive harm engendered by the order itself, since this may well be greater than the risk of moral injury which it purports to guard against. Recognizing the great margin of error involved in forecasting human behavior, still, I cannot overlook the obvious natural tendency of the order to encourage an estrangement of the father from the children.
Defendant is evidently fond of this woman. She has taken on an important meaning in his life, and, although their relationship has not been solemnized, it is not a transient promiscuity. The sincerity of his belief that the children will benefit from her presence as a surrogate mother has not been questioned, and there is nothing unclean or indecent about this. If she were his live-in housekeeper, surely this demeaning choice would not be forced upon him. It is only because they have these human feelings for one another that a moral issue arises and he is made to purify his home of her presence as a condition to having the children overnight. The only certain consequence of these unreasonable ground rules is that defendant will now have to choose between his friend and his children, and in place of natural, spontaneous feelings these relationships will be increasingly governed by the process of cold and deliberate analysis. However *134 he chooses he must now pay a price, and this may eventually strain his relationship with the children. To this extent the children will be penalized, and without a single finding or proper reason given anywhere as to why this must be.
The restriction's benefits are speculative at best and threaten a greater harm at worst. I therefore regard the order below as an abuse of discretion, and accordingly would reverse.