274 N.J. Super. 429 (1994)
644 A.2d 638
DEBRA PASCALE, PLAINTIFF-APPELLANT/CROSS-RESPONDENT,
v.
JAMES PASCALE, DEFENDANT-RESPONDENT/CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 17, 1994.
Decided June 22, 1994.
*432 Before Judges DREIER, BROCHIN and KLEINER.
Laura M. Le Winn argued the cause for plaintiff-appellant/cross-respondent.
Bruce I. Afran argued the cause for defendant-respondent/cross-appellant.
The opinion of the court was delivered by KLEINER, J.S.C. (temporarily assigned).
The marriage of plaintiff, Debra Pascale, and defendant, James Pascale, was dissolved by a dual judgment of divorce entered September 11, 1992, after a six day trial. Plaintiff's appeal and defendant's cross-appeal, both contend, for different reasons, that the court erred in its decisions pertinent to equitable distribution of property and child support. Plaintiff also alleges that the court's counsel fee award was inadequate.
The litigants were married on June 19, 1977. Three children were born of their marriage: Kyle, on April 4, 1984, and twins, Lauren and Corrine, on April 16, 1986. In July 1990, the parties physically separated within the marital residence. Plaintiff filed a complaint for divorce on grounds of extreme cruelty on October 28, 1990, and defendant filed a counterclaim also alleging acts of extreme cruelty.
Prior to their trial, the parties submitted three consent orders to the court: on March 19, 1991, an order was executed allocating to each party specific financial obligations; on September 23, 1991, *433 a visitation and custody arrangement was approved;[1] on April 3, 1992, an order compelled defendant to vacate the marital residence and acknowledged that a revised court order would be required if a support agreement could not be negotiated.
At the time of trial, plaintiff was employed as a human resources manager at Liposome Company, Inc., a position she held since 1987. Defendant was employed as the administrator of Princetown Township, a position he held since 1983. Plaintiff earned $52,200 per annum and defendant earned $73,290. Testimony indicated that defendant anticipated receiving a salary increase to $76,938 per annum if the then pending municipal budget was approved.

MARITAL HOME
The trial court determined that the marital home was valued at $270,000 and was owned subject to a first mortgage of $96,600. The home, titled jointly, was purchased in January 1986 with a down payment of $90,000. That sum represented accumulated marital savings derived primarily from salaries and proceeds from the sale of IBM stock which yielded $35,000. That stock had been gifted to plaintiff prior to marriage and had remained titled in plaintiff's maiden name until it was transferred to a joint brokerage account in 1985 in anticipation of the home purchase. The court divided the value of the home equally. It determined that defendant's interest would be $72,700 computed as follows: marital home value, $270,000, less $96,600 owed on the first mortgage, less $14,000 owed to plaintiff resulting from an equitable and equal division of defendant's pension plan. The court ordered defendant to convey title to plaintiff subject to the first mortgage effective October 1, 1992, and ordered plaintiff to pay defendant $72,700 on or before September 1, 1997, and to satisfy the existing first *434 mortgage debt that same date. The $72,700 debt owed by plaintiff would accrue simple interest at 8 percent per annum effective January 1, 1994. The court specifically denied plaintiff's demand that she receive credit for her contribution to the original purchase price of $35,000 derived from the sale of IBM stock.
Plaintiff contends the denial of this claimed credit of $35,000 was error. Defendant contends that the five year deferral of his receipt of the home equity of $72,700 was error.
We recognize that property owned by a spouse prior to marriage remains the separate property of the spouse and is not distributable. Painter v. Painter, 65 N.J. 196, 214, 320 A.2d 484 (1974); Orgler v. Orgler, 237 N.J. Super. 342, 350-51, 568 A.2d 67 (App.Div. 1989). Additionally,
"the income or other usufruct derived from such property, as well as any asset for which the original property may be exchanged or into which it, or the proceeds of its sale, may be traceable shall similarly be considered the separate property of the particular spouse. The burden of establishing such immunity as to any particular asset will rest upon the spouse who asserts it."
[Painter v. Painter, supra, 65 N.J. at 214, 320 A.2d 484; See also Landwehr v. Landwehr, 111 N.J. 491, 504, 545 A.2d 738 (1988).]
However, we also recognize that interspousal gifts are subject to equitable distribution. N.J.S.A. 2A:34-23; Perkins v. Perkins, 159 N.J. Super. 243, 246, 387 A.2d 1211 (App.Div. 1978); Pascarella v. Pascarella, 165 N.J. Super. 558, 564, 398 A.2d 921 (App.Div. 1979).
Although plaintiff's IBM stock is clearly identifiable as premarital property and the proceeds are clearly traceable, the testimony of the parties and their standard of living negates any possible conclusion that it was plaintiff's intent to preserve a separate ownership interest in the proceeds derived from the sale of that stock.
This couple entered marriage as a young couple without any appreciable assets other than plaintiff's IBM stock. Until their severe marital discord commenced, they shared all of their income and all of their liabilities. They were clearly united economically. Their decision to purchase the marital home and title it jointly was *435 a joint decision as was the decision to sell the IBM stock and to apply the proceeds to their down payment to reduce their joint mortgage indebtedness. Prior to their marital discord neither took any affirmative step which would evidence an intent that the IBM stock was not an interspousal gift. Wadlow v. Wadlow, 200 N.J. Super. 372, 380-81, 491 A.2d 757 (App.Div. 1985) (the terms of a will evidenced intent of the husband to acknowledge that certain co-mingled funds were still the property of his wife's family).
Although the trial court is permitted to recognize that the acquisition of certain property may be traced more directly to one partner than the other, the court is not compelled to distribute property to accommodate that origin. Perkins v. Perkins, supra, 159 N.J. Super. at 247, 387 A.2d 1211. The court's denial of plaintiff's claim of total credit of $35,000 or its failure to treat the distribution of the marital home unequally was not an abuse of its discretion and we shall not disturb that decision.
We reach the same conclusion in reviewing the court's decision to permit plaintiff to reside in the home for five years. Trial courts have the discretion to permit post-divorce possession "for good reason." Daly v. Daly, 179 N.J. Super. 344, 350, 432 A.2d 113 (App.Div. 1981); Gemignani v. Gemignani, 146 N.J. Super. 278, 284, 369 A.2d 942 (App.Div. 1977). "Underlying the permission to the wife to remain in the home is the joint duty of the parties to provide suitable shelter for the children. A correlative is the recognition that available economic resources are usually not sufficient to provide a comparable residence if the asset is liquidated." Daly v. Daly, supra, 179 N.J. Super. at 350, 432 A.2d 113 (citation omitted). This by no means requires a showing of economic hardship on the part of the possessory spouse. Id.
Here, plaintiff asked the court to allow her to remain in the marital home for a five year period  until Kyle began high school and until the twins began their new school. The trial court did not find this request "unreasonable." We also find it was reasonable *436 to grant such a request under the present circumstances. The parties' three children have lived in the marital home all their lives. The children are at the present time ages ten and eight. It is reasonable to infer that requiring them to move due to an immediate sale of the house would not be in the best interests of the children. Moreover, defendant's interest in the house is preserved as he is receiving compensation at a reasonable interest rate for having to wait for his distribution.
As we noted in Daly v. Daly, id., at 350-51, 432 A.2d 113:
This delayed realization [of a spouse's distributive share of the marital residence] must be recognized by a reasonable rate of interest, ... or an equity interest in the asset.... Any final decisions should recognize (1) a fair return for delayed realization, (2) or an equity interest, and (3) the extent of each party's contribution to the protection and enhancement of the asset prior to sale.
Here, it is clear that the trial court fully recognized the criteria discussed in Daly. Requiring, as defendant demands, that plaintiff demonstrate the non-existence of other affordable housing within the same community as a prerequisite to a grant of a reasonable request to remain in the marital home for a fixed and relatively short period of time will not be sanctioned by this court nor will we declare that the trial court's refusal to mandate that proof constitutes an abuse of discretion. The court's decision was carefully reached and should be affirmed in the absence of any specific proof that the decision was arbitrary or unreasonable.
We reach the same conclusion with respect to defendant's additional argument that the equitable distribution value should await a determination of the actual value as of the date of payment to him of his interest in the property. Although the decision to defer valuation may have merit in individual cases, we cannot discern any particular reason why the rejection of that concept here was error. This is particularly true where the court carefully imposed a definite date for final payment, included an appropriate interest factor of 8 percent per annum, and imposed an obligation that plaintiff also satisfy the first mortgage debt as of the date of ultimate settlement.

*437 STOCK OPTIONS
Plaintiff commenced employment with her employer on April 14, 1987. She was immediately granted the option to purchase 5,000 shares of stock in her employer's company. As of the date of trial, plaintiff owned the following options:

 Date Granted Optional Shares
 April 14, 1987[2] 5,000
 June 7, 1989 650
 November 30, 1989 5,650
 January 4, 1990 1,469
 November 7, 1990 4,000
 November 7, 1990 1,800
 November 15, 1991 1,500

The trial court excluded from distributable assets the stock option dated November 15, 1991, but divided all other stock options equally. Plaintiff contends that the court erred in its inclusion of the two options granted November 7, 1990, as those options were received after her complaint was filed on October 28, 1990.
The court is authorized "to effectuate an equitable distribution of the property, both real and personal, which was legally and beneficially acquired by [the parties] or either of them during the marriage." N.J.S.A. 2A:34-23. Stock options are considered property subject to equitable distribution. Callahan v. Callahan, 142 N.J. Super. 325, 361 A.2d 561 (Ch.Div. 1976).
"[F]or purposes of determining what property will be eligible for distribution the period of acquisition should be deemed to terminate the day the complaint is filed." Painter, supra, 65 N.J. at 218, 320 A.2d 484 (footnote omitted); see also Chalmers v. Chalmers, 65 N.J. 186, 192, 320 A.2d 478 (1974). The Court in Painter noted:

*438 We are under no illusion that what we have said above will provide certain and ready answers to all questions which may arise as to whether particular property is eligible for distribution. We have sought only to implement the legislative intent, as we discern it, by setting forth what we believe should be the general governing rules. Individual problems must be solved, as they arise, within the context of particular cases.
[65 N.J. at 218 n. 7, 320 A.2d 484.]
Exceptions to the date of complaint rule may exist where there are "reliable indicia of an end of the marital partnership other than the filing of a complaint for divorce," Brandenburg v. Brandenburg, 83 N.J. 198, 206, 416 A.2d 327 (1980), such as a written separation agreement, Smith v. Smith, 72 N.J. 350, 361-62, 371 A.2d 1 (1977); Carlsen v. Carlsen, 72 N.J. 363, 369-71, 371 A.2d 8 (1977), or an oral separation where the parties have orally agreed to a particular division of the marital assets, Di Giacomo v. Di Giacomo, 80 N.J. 155, 159, 402 A.2d 922 (1979). In the absence of these indicia, however, Brandenburg v. Brandenburg, supra, 83 N.J. at 209-210, 416 A.2d 327, suggests a strict application of the date of complaint rule:
In the absence of a qualifying separation agreement, the date a complaint is filed will fix the termination date of a marriage for purposes of equitable distribution. If the parties have entered into a written separation agreement accompanied by actual physical separation, the date of the agreement will terminate the period of acquisition of distributable assets. If the parties have separated in fact and divided their property pursuant to an oral agreement, assets acquired afterwards are not eligible for equitable distribution.
While these rules govern the eligibility of assets for equitable distribution, they do not prescribe the manner of that distribution.
[Emphasis added; footnote omitted.]
While recognizing the import of the complaint filing date as generally dispositive of the date upon which equitable distribution will focus, the trial court also recognized that a court may be "flexible" in its decision to include or exclude property from equitable distribution consideration. Weiss v. Weiss, 226 N.J. Super. 281, 543 A.2d 1062 (App.Div.), certif. denied, 114 N.J. 287, 554 A.2d 844 (1988); Kikkert v. Kikkert, 177 N.J. Super. 471, 427 A.2d 76 (App.Div.), aff'd o.b., 88 N.J. 4, 438 A.2d 317 (1981).
In Kikkert, the court characterized a pension interest as:

*439 the result of direct or indirect efforts expended by one or both parties to the marriage  it is additional compensation for services rendered for the employer and a right acquired during the marriage. Hence, equitable considerations mandate its inclusion for distribution where, as here, the employee has already qualified for benefits and the other spouse, during the marriage, has foregone enjoyment of that additional compensation represented by the cost of the plan whether or not it requires employee contributions. Each spouse had the same expectation of future enjoyment with the knowledge that the pensioner need only survive to receive it.
[177 N.J. Super. at 476-77, 427 A.2d 76.]
The trial court clearly construed plaintiff's receipt of stock options ten days after the divorce complaint was filed as a form of "compensation" for past employee services rendered. As those services were performed by plaintiff during the marriage, the options attributable to those services are distributable. Ibid. Plaintiff argues that the options were granted to induce plaintiff to remain with her employer and to promote continued effective services. As they were given to her in anticipation of future services, the options should be excluded from equitable distribution, as in Ryan v. Ryan, 261 N.J. Super. 689, 619 A.2d 692 (Ch.Div. 1992).
We conclude that the two separate options received by plaintiff on November 7, 1990 were granted for separate distinct reasons and should not be treated alike. The option of 4,000 shares of stock was given in recognition of a promotion in job responsibility and was accompanied by an increase in salary. Both future job responsibility and future salary, although a reward for past performance, are designed as appropriate compensation and incentive for future efforts which will, in this case, be expended after the marriage is dissolved. Plaintiff testified that she had received a prior salary increase in April 1990 but did not receive any stock options. She also indicated that traditionally her employer awarded stock options when employees were promoted. Although we recognize that the option of 4,000 shares does recognize past employee achievement, it more appropriately is designed to enhance future employee efforts. On balance, this option should not have been included in the equitable distribution analysis.
*440 The option for 1,800 shares of stock was, however, clearly a recognition of plaintiff's past employment performance. This grant was awarded to all employees and the number of shares granted related to the number of shares of stock or unexercised options held by each employee. Additionally, a letter from the employer's representative which accompanied the option documents indicated that the option for 1,800 shares was "in recognition of the contribution that you have made." (Emphasis added.) The court did not mistakenly exercise its discretion in its inclusion of that option within the property subject to equitable distribution. Kikkert v. Kikkert, supra, 177 N.J. Super. at 476-77, 427 A.2d 76.

CHILD SUPPORT
By agreement, the parties are the joint custodians of their three children, but plaintiff is recognized as the residential custodian. That arrangement follows the decision in Beck v. Beck, 86 N.J. 480, 432 A.2d 63 (1981), where the Supreme Court stated:
Because we are persuaded that joint custody is likely to foster the best interests of the child in the proper case, we endorse its use as an alternative to sole custody in matrimonial actions. We recognize, however, that such an arrangement will prove acceptable in only a limited class of cases.... [D]espite our belief that joint custody will be the preferred disposition in some matrimonial actions, we decline to establish a presumption in its favor or in favor of any particular custody determination.
[Id. at 488, 432 A.2d 63 (footnote omitted).]
The court in Beck further explained:
If joint custody is feasible except for one or more of these practical considerations, the court should consider awarding legal custody to both parents with physical custody to only one and liberal visitation rights to the other. Such an award will preserve the decision-making role of both parents and should approximate, to the extent practicable, the shared companionship of the child and noncustodial parent that is provided in joint physical custody.
[Id. at 500, 432 A.2d 63 (emphasis added).]
The September 23, 1991 consent order provided that defendant is to have visitation with the children Wednesdays and Thursdays from the conclusion of the school day to 8:30 p.m., or as otherwise mutually agreed; during summer vacations or school holidays, overnight visitation on Wednesdays and Thursdays and the following *441 day; twenty-four hours on alternate Saturdays and Sundays, from either 6:00 p.m. Friday to 6:00 p.m. Saturday or 6:00 p.m. Saturday to 6:00 p.m. Sunday; Father's Day; alternate children's birthdays; minimum one week vacation during summer vacation.
Because the defendant has substantial visitation with the children, the defendant contends that the court erred in its determination of child support.
At trial and in her pleadings plaintiff sought a court order establishing child support at $1,500 per month. The trial judge established the child support obligation at $1,250 per month until August 1, 1993, and thereafter at $1,150 per month. Additionally, defendant is required to pay the cost of the children's Hebrew school, but is relieved of any obligation to pay for orthodontia and summer camp expenses. Plaintiff must pay the cost of synagogue membership. Defendant also must pay the first $500 of unreimbursed medical expenses of the children, and thereafter any unreimbursed medicals are paid 60 percent by defendant and 40 percent by plaintiff. Both parties are to contribute to the college expenses of the children "in a fair manner depending on their financial circumstances at the time."
Plaintiff contends that the award of child support was inadequate and in disregard of the Child Support Guidelines, Pressler, Current N.J. Court Rules, Appendix IX-A (1994). Defendant contends that the award was excessive as it fails to reflect his substantial parenting obligations attributable to the custody/visitation arrangement, including the necessity to provide appropriate food, shelter, and necessities, during his extensive periods of overnight visitation. The essence of defendant's argument may be summarized: the Child Support Guidelines were designed to create a uniform system to establish child support obligations affecting "traditional" custody and visitation arrangements but should not be utilized in a "non-traditional" arrangement, such as the joint custody arrangement agreed to by the parties. Defendant argues that the trial court disregarded this argument and as such committed reversible error.
*442 Appendix IX-A, entitled "Considerations in the Use of Child Support Guidelines," contains a caveat immediately after a preliminary introductory paragraph:
Considerations which may make these child support guidelines inapplicable or cause the child support amount to be adjusted are:
(1) Application of the Child Support Guidelines.
(a) Income Below the Poverty Level....
(b) Income Above $52,000. These guidelines are intended to apply to all actions to establish a child support award. If the combined net family income exceeds $52,000, the court shall apply the guidelines up to that amount and supplement the guidelines award with an additional support amount based on the remaining family income and the factors enumerated in N.J.S.A. 2A:34-23.
(2) Custody Arrangements.
These child support guidelines are intended to be applied to cases having traditional custody and visitation arrangements.

The above enumerated considerations should not limit the Court from taking into account other significant factors which may cause these child support guidelines to be inapplicable or cause the child support amount to be adjusted.
[Emphasis added.]
The text of the guidelines as adopted does not define the phrase "traditional custody and visitation arrangements." However, the Subcommittee on Judicial Support Guidelines Report to the Family Division Practice Committee of the New Jersey Supreme Court, reprinted at 116 N.J.L.J. 813, 826 (1985), does state:
The Subcommittee structured the child support guidelines on traditional custody and visitation arrangements (where one parent has sole legal and physical custody and the other has limited visitation rights). Non-traditional custody and/or visitation is listed as a consideration which would cause the guideline to be inapplicable or require an adjustment of the guideline amount.
The Subcommittee Report, which pre-dated Beck v. Beck, supra, decided July 2, 1981, also provides:
In realizing the prominence of joint physical custody in today's society, the Subcommittee suggests that in the event joint custody becomes more common in New Jersey, a worksheet could be developed to adjust the base child support amount each parent owes by the proportion of time the child spends with the other parent.
[116 N.J.L.J. at 826.]
The Subcommittee Report has provided assistance to this court, Chobot v. Chobot, 224 N.J. Super. 648, 654, 541 A.2d 251 (1988), and we conclude that its insight must be heeded not only in the *443 ideal custody arrangement described in Beck v. Beck, supra, 86 N.J. at 488, 432 A.2d 63, but also in those custody arrangements utilizing a joint custody concept with one parent designated as residential custodian. Where the non-physical custodial parent assumes parental obligations in excess of visitation limited to one day per week, the recommendations should be evaluated by the court and adopted where practical.
In this case, the parties have consented to a custodial arrangement which, although not completely replicating the custody model discussed in Beck v. Beck, id., is substantially different than the "traditional" custody arrangement. The parties have divided their arrangement into two categories: school periods and non-school periods encompassing school holidays, summer recess and vacations.
During non-school periods, custody is shared as follows:
[P]laintiff has custody on Monday and Monday night, Tuesday and Tuesday night, and Wednesday during the day; the defendant has custody on Wednesday night, Thursday and Thursday night and Friday during the day. The remaining period is the weekend, which as defined in paragraph "3" of the consent order as being shared on a [sic] even, alternating basis, with one parent having custody on Friday night begining [sic] at 6 P.M. and through 6 P.M. on Saturday. The other will have custody on Saturday night beginning at 6 P.M. and continuing through 6 P.M. on Sunday. The children's mother has custody on Sunday nights after 6 P.M.
During school periods, the schedule above is repeated, however, on Wednesday and Thursday evenings the children are returned to plaintiff's home at 8:30 p.m. and do not spend overnight hours with defendant.[3] The trial judge characterized the parties' custody arrangement as intended to "create a post-marital unified family with two residences," yet the court refused to recognize that the arrangement was a deviation from the "traditional" custody arrangement. The trial court specifically stated:

*444 [I] do not believe that defendant has demonstrated why the present arrangement is not traditional. In fact, there has been no showing before this court of any authority holding that a particular arrangement is or is not traditional. So we don't really know what the word non-traditional means  what the word traditional means as used in the court rules. I do recognize that.
We conclude that the trial court's refusal to recognize that the custody arrangement in this matter as atypical was error and may have precluded its appropriate consideration of a support arrangement other than the payment of support by one parent to the residential custodian. In this instance, the court failed to recognize that the non-residential custodian bears a significant financial burden in performing parental obligations. As an example, defendant's shelter expenses are substantially increased in providing housing designed to accommodate himself and three children as compared to the shelter expenses which he would have required for himself without a provision granting him overnight visitation with three children on a continual basis including summers and holidays. As a non-residential parent's visitation increases, child care expenses also increase, with a like concomitant reduction in expenses, other than basic living expenses (e.g. shelter), of the residential custodian. This disparity was recognized in the Subcommittee Report, supra, which indicated that the non-traditional custody arrangement may require adjustment, 116 N.J.L.J. at 826, and as thereafter adopted in Appendix IX-A, to the effect that a custody arrangement, "may cause these child support guidelines to be inapplicable or cause the child support amount to be adjusted."
In a traditional custodial arrangement, the custodial parent is entrusted with the responsibility of all financial decisions affecting the lives of the children of the marriage. As time-sharing between parents increase, the non-residential parent is required to make financial decisions and must have the financial ability to effectuate those decisions. We conceive that allowing a child to perceive the residential custodial parent as the sole provider of necessities and all discretionary purchases, diminishes the importance or esteem of the non-residential custodial parent. For these *445 reasons, child support must be adjusted and must be apportioned between the parties.
The utilization of a non-traditional custody/visitation arrangement does not allow the court to disregard the Child Support Guidelines. Those guidelines must be utilized up to $52,000 in combined income. Combined income in excess of $52,000 per annum must be allocated utilizing the criteria delineated in N.J.S.A. 2A:34-23a. The court may not simply extrapolate the guidelines to the combined income in excess of $52,000 per annum. Walton v. Visgil, 248 N.J. Super. 642, 649, 591 A.2d 1018 (1991).
In this matter the trial court recognized its obligation to utilize the statutory criteria, N.J.S.A. 2A:34-23a, in establishing a support order; however, the court did not explain its method of calculation and failed entirely to delineate its reasons for reducing child support from an initial award of $1,250 per month to a permanent award of $1,150 per month effective August 1, 1993.
Our ability to review this order is substantially hampered by the absence of articulated reasons or findings of fact. In the absence of any delineation of reasons, we are unable to say that this award was reasonable and predicated upon the evidence in the record, nor can we conclude that the order was "manifestly unreasonable, arbitrary, or clearly contrary to reason or to the evidence, or the result of whim or caprice." DeVita v. DeVita, 145 N.J. Super. 120, 123, 366 A.2d 1350 (App.Div. 1976). Recognizing as we have that the trial court was inflexible in its refusal to recognize that the custody/visitation arrangement here may require a flexible or even a novel approach, we are constrained to reverse the support order as entered and to remand this matter for reconsideration. The trial judge may in the exercise of his discretion expand the record to include an evaluation of the existent order based upon the experience of the parties since September 11, 1992.

COUNSEL FEES
An award of counsel fees is permitted in family actions, R. 4:42-9(a)(1), and is generally predicated upon financial considerations of *446 the parties as well as the good faith of the parties in pursuing litigation. N.J.S.A. 2A:34-23a; Williams v. Williams, 59 N.J. 229, 233, 281 A.2d 273 (1971). An award of counsel fees will not be disturbed unless it is found to be an abuse of the court's discretion. Ibid; Guglielmo v. Guglielmo, 253 N.J. Super. 531, 544-45, 602 A.2d 741 (App.Div. 1992).
Here, plaintiff's certification indicated that her attorney expended 110.4 hours and billed $20,213.80. Defendant's certification indicated an expenditure of 167.8 hours and a billing of $35,237.00. The court evaluated the respective income of the parties and noted that defendant's insistence that the court consider a "non-traditional" support order consumed an inordinate amount of litigation time, yet it inexplicably awarded plaintiff only $2,000 in counsel fees. We are somewhat perplexed by that ruling. As the court will be reconsidering the order as to child support, we conceive that the court should reevaluate its counsel fee award. We do not wish to imply that the award was erroneous. The absence of specific reasons for the award renders our review difficult, if not impossible.
The components of the divorce judgment pertinent to child support and counsel fees are reversed and remanded for reconsideration after proceedings conducted in accordance with this opinion. The court's division of the stock option of November 7, 1991 of 4,000 shares of stock is reversed and that option is deemed exempt from equitable distribution. All other aspects of the divorce judgment are affirmed.
NOTES
[1] Testimony at trial indicated that one spouse would either be physically absent from the home or would remain in a separated area within the home while the other spouse exercised visitation with the children.
[2] The stock option of April 14, 1987 was later exchanged, on October 28, 1987, due to a company decision necessitating repricing due to a decline in the stock value.
[3] During non-school periods it appears that plaintiff has the children ninety-six hours per week and defendant has the children seventy-two hours per week. During the school periods, plaintiff's hours increase to 116 hours per week and defendants decrease to forty-two hours per week. These figures are approximations.