In the Matter of PHILIP FELDMAN, Respondent, *v.* MADY FELDMAN, Appellant.

Second Department, July 15, 1974.

*Brecher & Yodowitz (David Brecher* of counsel), for appellant.
*Irving Mandell* for respondent.

BENJAMIN, J. In this habeas corpus proceeding, treated by the Special Term, upon consent, as an application to modify the custodial provisions contained in the parties' judgment of divorce, the court transferred from the mother to the unmarried father the custody of their two infant children (ages six and nine) who previously thereto had continuously resided with their mother since birth.

The issue presented is whether the court's determination, cloaked in the rubric " best interests of the child ", was, in fact, based upon its subjective moral judgment rejecting and in effect severely punishing this sexually-liberated divorced woman for her " life-style " and personal beliefs.

The pertinent facts are that the parties were married in April, 1962, when she was 18 and he was 19 years of age. During the marriage the husband, who supplemented his income as a part-time musician frequently entertaining at " singles dances ", was himself involved in several extramarital affairs. In July, 1970 the wife obtained a divorce based upon his cruel and inhuman treatment and, pursuant to the parties' separation agreement, was awarded custody of their two minor children. Subsequent to her divorce the former wife began dating an individual who she later learned was married but with whom she nevertheless continued to socialize.

In August, 1973 the former husband brought this proceeding, in habeas corpus, seeking custody of the children, alleging in his petition, *inter alia,* that on a visit to his former wife's home he observed on her night table a copy of *Screw* magazine (a publication which in my opinion possesses dubious redeeming social value) and, additionally, that he found letters (some with explicit photographs attached) upon the dining room and kitchen tables addressed to a post office box. The letters were in response to an advertisment placed by his former wife and her male companion in *Screw* magazine. The advertisement solicited responses from " other * * * couples or groups * * * for fun & games."

At the hearing which was held upon the petition the former wife admitted placing the advertisement but stated that it was done merely for " kicks ", an apparent reference to the bizarre responses which the advertisement elicited. However, and this is the important point, the evidence upon the hearing established that the mother's private sex life in no way involved or affected the children (under cross-examination the father acknowledged that the children never saw or commented upon the offensive material referred to in his petition). Moreover the evidence

established that the children were well provided for both emotionally and physically (in fact both youngsters were elected as class officers in school), that the atmosphere of the mother's home was happy and cheerful and the premises well kept and comfortable and that the mother was sincerely concerned and devoted to the children and bestowed upon them an abundance of love and care. In fact the Special Term never found the mother to be " unfit ", but based its decision to transfer custody on a subjective evaluation of her " life-style " as indicated by the following excerpt from its decision: " The record. and exhibits indicate her desire to experiment sexually. It cannot be that the best interests and welfare of the two impressionable children of the marriage will be best served by, awarding their custody ' to one who proclaims, and lives by, such extraordinary ideas of right conduct.' (*Bunim* v. *Bunim*, 298 N. Y. 391, 394) ".

In my opinion, amorality, immorality, sexual deviation and what we conveniently consider aberrant sexual practices do not *ipso facto* constitute unfitness for custody. In the instant case, assuming *arguendo* the complete truth of the father's petition, the total evidence of exposure of the children to the " swinging " practices of the mother is the inadvertent presence on two tables of letters in answer to the above-mentioned advertisement. By its decision herein the trial court stated, in effect, that all fathers and mothers who participate in this culture of " free sex " are unfit parents. The logical extension of the rationale of the trial court's position is to place the children of " swinging " couples in foster homes or orphanages. I cannot subscribe to such a proposition.

Additionally, during the course of the hearing it became increasingly apparent that the former wife's interest in sexually oriented literature was considered a determining factor militating against her continued custody of her children. At one point during the hearing the court queried: " Did you ever have Playboy Magazine in your house? THE WITNESS: Yes * * *. THE COURT: Playboy? " At another point the former husband's attorney read into the record a statement detailing the alleged evils of pornography by former FBI Director J. Edgar Hoover.

Although the contents of *Screw* magazine may be offensive to some, I am of the opinion that the courts are constitutionally prohibited from taking any punitive measures calculated to inhibit or restrict an individual from reading any matter in the privacy of his or her own home. In *Stanley* v. *Georgia* (394 U. S. 557) the Supreme Court held that the First and Fourteenth

Amendments prohibit making the mere private possession of obscene material a crime. In *Stanley* the Supreme Court stated, with respect to a person's right to privacy, the following (pp. 564-565):

"For also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy. * * *

"These are the rights that appellant is asserting in the case before us. He is asserting the right to read or observe what he pleases — the right to satisfy his intellectual and emotional needs in the privacy of his own home. He is asserting the right to be free from state inquiry into the contents of his library. Georgia contends that appellant does not have these rights, that there are certain types of materials that the individual may not read or even possess. Georgia justifies this assertion by arguing that the films in the present case are obscene. But we think that mere categorization of these films as 'obscene' is insufficient justification for such a drastic invasion of personal liberties guaranteed by the First and Fourteenth Amendments. Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home. If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds."

In my opinion the right of a divorced woman to engage in private sexual activities, which in no way involve or affect her minor children, is within the penumbra of that yet ill-defined area of privacy mandated by the specific guarantees of the Bill of Rights (cf. *Griswold* v. *Connecticut*, 381 U. S. 479). In *Griswold* the Supreme Court stated (p. 483): "The First Amendment has a penumbra where privacy is protected from governmental intrusion. In like context, we have protected forms of 'association' that are not political in the customary sense but pertain to the social, legal, and economic benefit of the members." The courts have on occasion recognized the right of an unmarried male to engage in extramarital sexual relations without being branded a "social leper", and there appears to be no rational basis to impose a more stringent standard upon a divorced woman. In *Schmidt* v. *United States* (177 F. 2d 450, 452), Judge LEARNED HAND stated: "We have answered in the negative the question whether an unmarried

man must live completely celibate, or forfeit his claim to a ' good moral character ' ".

Here it should be noted that *Bunim* v. *Bunim* (298 N. Y. 391, *supra*), relied upon by the Special Term, involved repeated adulterous acts by a *married* woman and is therefore inapposite to the instant case, which involves the activities of a divorced woman. The law is well established that even adulterous acts do not *ipso facto* present a sufficient basis for denying continued custody to a mother (*Matter of Rodolfo " CC "* v. *Susan " CC "*, 37 A D 2d 657; *Sheil* v. *Sheil,* 29 A D 2d 950; see, also, *Matter of Raya,* 255 Cal. App. 2d 260; 15 N. Y. Jur., Domestic Relations, § 355; 2 Foster-Freed, Law and the Family, § 29:8; Boardman's New York Family Law, § 276). In the case of *Matter of Rodolfo " CC "* v. *Susan " CC "* (*supra*, p. 657), the court stated, as here pertinent: " As for appellant's moral conduct, while there is proof that men on occasion remained overnight in appellant's apartment while Robert was present and with his apparent knowledge, there is no showing that appellant was guilty of such gross moral turpitude as would render her unfit for custody particularly since there is no showing that such conduct was actually affecting Robert's upbringing ".

In the instant case our sole concern is for the best interests of the children (Domestic Relations Law, §§ 70, 240). As both children have resided with the mother since birth, a change of custody at this late date should not be made unless there is a showing that she is unfit to continue as the custodial parent (*Aberbach* v. *Aberbach,* 33 N Y 2d 592; *Nierenberg* v. *Nierenberg,* 43 A D 2d 717; *Matter of Lang* v. *Lang,* 9 A D 2d 401, affd. 7 N Y 2d 1029; *People ex rel. Bruen* v. *Bruen,* 38 A D 2d 725; *Schuler* v. *Schuler,* 29 A D 2d 669; *Matter of Metz* v. *Morley,* 29 A D 2d 462). The facts of the instant case parallel in pertinent aspects those of *Nierenberg* (*supra*, pp. 717–718), where we stated in our opinion: " Custody of this child of tender years has been in the mother pursuant to a separation agreement which became incorporated into a foreign decree of divorce in 1969. The Family Court specifically found the mother not to be unfit. We have reviewed the record and found that the mother is neither unfit nor less fit than the father. Under these circumstances, it was error for the Family Court to change custody to the father ".

In this case the father, to whom the court awarded custody, is not presently remarried and lives in a room in his parents' apartment. He is employed on a full-time basis during the day and the record indicates he works on the average of two

nights per week as a musician. The traumatic psychological dislocation which these two children of tender years would suffer from the change of custody ordered by the trial court would render them tragic casualties of this marital conflict.

The order under review should be modified, on the law and the facts, by striking therefrom all the decretal provisions other than the one which awarded a counsel fee and substituting therefor a provision denying the petition; and, as so modified, the order should be affirmed, without costs.

SHAPIRO, J. (concurring). The order appealed from modified the judgment of divorce obtained by the appellant wife by altering the custody provision of the judgment of divorce. It transferred the custody of the two infant children of the marriage, a boy, Scott, 10, and a daughter, Joyce, 6, from the mother to the father. The memorandum opinion of the trial court accompanying the order of transfer stated:

" This Court is of the opinion that the promiscuous activities of the plaintiff mother are not in keeping with the best interests of the children. One of the witnesses on the trial was a married man who admitted socializing with the plaintiff mother, and it is evident to this Court that the relationship between the two was most intimate in and out of her apartment. Both children of the marriage seem to know this man quite well. There were also written articles and photographs of a prurient nature lying around the apartment exhibiting and indicating promiscuous and lascivious tastes on the part of the plaintiff, not only with her paramour but other coupled individuals. The record and exhibits indicate her desire to experiment sexually. It cannot be that the best interests and welfare of the two impressionable children of the marriage will be best served by awarding their custody ' to one who proclaims, and lives by, such extraordinary ideas of right conduct.' (*Bunim* v. *Bunim,* 298 N. Y. 391, 394.) This Court in arriving at its conclusion has considered not only the evidence adduced at the hearing, but also the contents of the Probation Department report that had been submitted to this Court, as well as the psychiatric evaluation report, both of which are made a part of this record and sealed.

" The evidence before this Court further indicates that the defendant father is presently keeping company with a woman whom he intends to marry and will maintain a proper and decorous home life for the children."

The findings of the trial court that there " were also written articles and photographs of a prurient nature lying around the apartment exhibiting and indicating promiscuous and

lascivious tastes on the part of the plaintiff, not only with her paramour but with other coupled individuals '' find no support in either the testimony heard by the court or the Probation Department report or the psychic evaluation report. The sole evidence as to written articles of a prurient nature in the apartment is that the father found a copy of *Screw* magazine on the dresser in the mother's bedroom and another copy on an upper shelf of the kitchen closet well out of the reach of the children. The photographs of a prurient nature described by the trial court as '' lying around the apartment '' were not in plain view. The only testimony with regard to the photographs comes from the father, who said: '' Then I sat down at the dining room table to look at — they had Newsday there and I was just leaning against the vase — she had some flowers — there was an envelope with a picture sticking out of it a little bit that said ' Post Office Box ' so and so occupant New York City and I don't know what made me look at it — it was just being I saw a photograph I thought maybe it was someone in the family or something, someone I knew, so I took a look inside the envelope and I saw a picture of a nude couple with a letter attached.''

He then '' looked a little bit further '' and found '' a couple more letters and some were closed and some were open.'' He looked in the ones that were open and found additional letters and pictures. The following Saturday he found the letters still there and there were others in the kitchen on the refrigerator and in the kitchen closet on a shelf six feet above the floor. *There is no evidence, or even a claim, that the publications or pictures or letter contents were ever seen by the children.*

There is nothing in the record or in the Probation Department or psychiatric reports to sustain the trial court's finding of '' promiscuous and lascivious tastes on the part of the plaintiff, not only with her paramour but other coupled individuals '' which '' indicate her desire to experiment sexually ''. Nor is there any testimony or other material in the record to sustain the trial court's characterization of the mother as '' one who proclaims, and lives by, such extraordinary ideas of right conduct '', unless one infers that having two copies of a magazine such as *Screw* in one's apartment and advertising in that magazine and speaking to and meeting some of those who respond to such an advertisement sustain such findings. Interest in, and even fascination with, such aspects of sex hardly establish a desire to experiment sexually or a pattern of gratifying promiscuous and lascivious tastes practiced with '' other coupled individuals ''.

What an examination of the record and the psychiatric reports seems to demonstrate is that they reflect the feeling of revulsion felt by most people, including professionally trained persons, upon seeing or reading about publications such as *Screw* and learning that some person has indicated an interest in the sexual practices promoted and praised in such a publication. This feeling may well be intensified if the person showing such an interest is a woman. Thus, Dr. Joseph Shapiro, the author of the psychiatric evaluations of the parties to this action, in his letters to the trial court stated: "Mr. Feldman's original appointment had to be changed to a later one on the same day that I saw Mrs. Feldman. Mr. Feldman appeared at my office at 9:45 A.M. to leave a large brown manila envelope containing several copies of 'Screw Magazine' and several letters with attached photos of nude couples apparently in response to an advertisement alleged to have been placed in the above mentioned magazine by Mrs. Feldman. *Had I not had this information I might not have reached the conclusions stated in the enclosed reports*" (emphasis supplied).

In his summary Doctor Shapiro speculates: "With respect to Mrs. Feldman one cannot help but wonder why, if it is true, would Mrs. Feldman leave a copy of 'Screw Magazine' on the dining room table where it was easily discovered by Mr. Feldman. * * * Is Mrs. Feldman consciously or pre-consciously hoping to lose custody of her children so as to be free to indulge herself in her sexual pursuits. Certainly the pornographic materials found by Mr. Feldman almost impels one to consider such possibility." But the fact is that there is no basis in the testimony of Mr. Feldman for any claim that Mrs. Feldman ever left a copy of *Screw* magazine on the dining room table. Therefore the psychiatrist's compulsion to consider the possibility that Mrs. Feldman wished to be freed of her children in order to "indulge herself in her sexual pursuits" is based on a supposition that is contrary to the facts in the record.

The reports of the psychiatrist further reflect the tremendous weight he gave to the fact that Mr. Feldman had found several copies of *Screw* magazine in Mrs. Feldman's home. The doctor mentions it twice in his report on the father, Philip Feldman, once when he quotes him as expressing the opinion that his former wife was a bisexual individual based on "his recent discoveries of his wife's interest in hard-core pornography" and a second time when he says, "He impressed me as being sincere when he talked of his concern for his children's well being, expecially [*sic*] since he discovered his wife's apparent

interest in hard-core pornography." On the other hand, in the report on Philip, the psychiatrist brushes off Philip's infidelity (promiscuity[?]) during his marriage with the sentence, "He did admit that during the marriage * * * he had been involved in several extra-marital affairs ".

In contrast, he concludes about Mrs. Feldman: "She impressed me as suffering from judgmental defect *as exemplified by her reasons for bringing hard-core pornography into her home,* her efforts to contact other people interested in a variety of sexual encounters and her seeming disregard of the possible unwanted impact such pornographic material could have on her children were they to accidentally stumble upon this material " (emphasis supplied). He concludes that the foregoing "judgmental defect" and her "thinly veiled" hostility toward her husband and the history of an unhappy adolescence suggest "chronic undifferentiated schizophrenia, which at present appears to be in a state of partial remission."

He says in his summary: "*If* Mr. Feldman marries this other woman and [*if*] she is willing to accept into the new family constellation the Feldman children and to give them a reasonable amount of maternal interest and care, I would be inclined to view Mr. Feldman as the more desireable [*sic*] parent to receive custody of his children at the present time " (emphasis and bracketed word supplied). He reaches this remarkable conclusion even though he has no knowledge of the character of the other woman.

The tendency to impose on a woman a standard with respect to sexual interests different from that applied to a man is clearly reflected in the opinion of the trial court. He said, "One of the witnesses * * * was a married man who admitted socializing with the plaintiff mother, and it is evident to this Court that the relationship between the two was most intimate * * *. Both children of the marriage seem to know this man quite well." The inclusion of this comment in the trial court's opinion contrasts with the following views he expressed during the cross-examination of the father:

"Q. Mr. Feldman, you have never witnessed Mrs. Feldman engage in any act of sex with any other individual from the time you were divorced from her in this very court until the present, is that correct?

THE COURT: Just a minute. How is that relevant?

MR. YODOWITZ: He has made accusations in his petition, Your Honor.

THE COURT: That what?

MR. YODOWITZ: That she has engaged in various acts of sexual conduct and numerous —

THE COURT: That is not the gravamen of this. *I am not interested in that.*

MR. YODOWITZ: As long as we understand, very good.

THE COURT: I am interested in a more promiscuous setup.

MR. YODOWITZ: I am confused. I must admit, Your Honor.

THE COURT: I mean the very fact that two people are divorced and either one or the other engages in conduct resulting in intercourse with another I don't see how that standing by itself has anything to do with the custody of the children."

The complete acceptance by the trial court of the father's announcement of his intention to be married (according to the father's brief on this appeal, "within a month") and his finding that the father "will maintain a proper and decorous home life for the children" flies in the face of the probation report which notes: "After he has had the kids for several months, he and she [a divorcee he has been dating for the last three years] will look for an apartment or a house. No date has been set for a wedding because 'a lot depends on the money situation. Barbara's husband ran off and left her. He is in Florida but she gets no support from him'".

The home visit report in the probation report indicates that the father intends to share his bedroom in his parents' apartment with the children, they sharing a high riser bed, he sleeping in his single bed, during a temporary period of adjustment on the part of the children, "before he finalizes his plans, hopefully within six months", which include "remarriage to a young lady that is presently known to the children, as well as the purchase of a new home".

The conclusion in the Probation Department report on this point is: "He talks of marrying again; however, this appears quite indefinite and at this point, it would be his mother who would assume the mothering role if the children were placed in his custody." The trial court utterly failed to refer to this conclusion; nor did it apparently note the sentence in the report that "it was only when we brought up the question of other women that he affirmed that he had been unfaithful during his marriage and his wife had known."

As Justice BENJAMIN's opinion notes, the evidence establishes that the children were well provided for emotionally and physically by the mother and the probation report clearly indicates that on a visit to the children the probation officer observed no discomfort on their part toward their mother, and that they

appeared quite comfortable and responsive to her. The home visit report states that her "apartment was very clean and it appeared that Mrs. Feldman was a good homemaker as well as housekeeper." The school reports with the probation report state, "Scott get [sic] along well with teachers and peers. He is outgoing in class and cooperative," and that Joyce "seems to be well adjusted."

In view of the foregoing, I believe that the trial court committed grave error in ordering the children, who had been with their mother from the time they were born, turned over to their father. First, the evidence in no way sustains the findings of the trial court. Rather it reflects the application of a discriminatory sexual standard based on the mother's evincing an interest in pornography and sexual freedom, in dating regularly, and having an intimate relationship with a married man who has no present intention of divorcing his wife. Secondly, the decision contradicts the trial court's statement made during the trial that a divorced person, *male or female,* has a right to engage in intercourse with another without affecting his or her right to custody of their children. The court's statement during the trial was a correct statement of the law, for there is a constitutional right of privacy spelled out (see *Griswold* v. *Connecticut,* 381 U. S. 479), not only with respect to social, legal and economic associations but also with respect to sexual association (see, also, *Stanley* v. *Georgia,* 394 U. S. 557).

I can find nothing in the record which shows any conduct on the appellant's part, as opposed to fearful conjecture, which poses such a danger to the continued welfare of her children if left in her custody as to overcome the inference that arose from the award of custody of the children to her in the decree which granted her a divorce based on her husband's cruel and inhuman treatment of her and his having been unfaithful to her during his marriage. Her having relations with a married man with whom she has gone out for three years and who is known to her children as her boy friend and (according to the probation report) to whom the children "did not seem particularly negative", whom Joyce likes and of whom Scott says, "He is okay", does not, as Justice BENJAMIN states in his opinion, present *ipso facto* a sufficient basis for denying the mother continued custody (see cases cited in that opinion and also *Christian* v. *Randall,* 516 P. 2d 132 [Col. Ct. of App., 1973]).

For the foregoing reasons, I concur in the modification of the order appealed from as indicated in the opinion by Justice BENJAMIN.

CHRIST, J. (concurring). I concur for the modification as indicated in the opinion by Justice BENJAMIN. I do not condone the mother's conduct and believe it to be contrary to good morals. However, the question before us is deeper than this. It is to determine where the children will be best located. The record indicates that they are well behaved and have been well cared for in the mother's charge. To transfer them to the uncertainty of the accommodations provided by the father which at the time of the hearing were meager at best would not be in the interests of the infants. The award of the children to the father was made upon the understanding that he would be married and would thereafter have a suitable home. The record does not indicate the marriage or such suitable home and upon the facts here I do not approve the transfer of custody from the mother to the father.

SHAPIRO and CHRIST, JJ. concur in separate opinions with BENJAMIN, J.; HOPKINS, Acting P. J., and MARTUSCELLO, J., dissent and vote to affirm.

Order of the Supreme Court, Nassau County, entered February 5, 1974 modified, on the law and the facts, by striking therefrom all the decretal provisions other than the one which awarded a counsel fee and substituting therefor a provision denying the petition. As so modified, order affirmed, without costs.