■ ARTHUR W. BRAIMAN, Respondent, v SHARON BRAIMAN, Appellant.— In a custody proceeding, the appellant mother appeals (1) as limited by her brief, from so much of an order of the Supreme Court, Dutchess County,

dated July 6, 1976, as, after a hearing, awarded custody of the parties' two male children to the petitioner father and relieved him of his support obligations with respect to the said children and (2) from two further orders of the same court, both dated October 27, 1976, the first of which denied her application for a counsel fee for the defense of the proceeding and the second of which denied her application for a counsel fee for the appeal. Order dated July 6, 1976 reversed insofar as appealed from, on the law and the facts, custody of the two male children is awarded to the parties jointly, and the petitioner-respondent is directed to comply with, and to provide support for the said children pursuant to, the relevant provisions of the separation agreement, including all fringe support provisions such as medical and dental expenses, college tuition and insurance. First above-mentioned order dated October 27, 1976 reversed, on the law and the facts, and the appellant is awarded a counsel fee of $6,500 for the proceedings at Special Term. Second above-mentioned order dated October 27, 1976 affirmed, with leave to appellant to reapply to Special Term for a counsel fee as to the appeal. The proceeding is remanded to Special Term for entry of an appropriate amended order pertaining to custody of the two male children in accordance herewith. The appellant mother is awarded one bill of costs to cover all appeals. The parties were married in 1967 and have three children: appellant's daughter Lynne, born on November 19, 1964 and adopted by the petitioner; Jason, born November 9, 1970; and Peter, born on March 11, 1972. It was the petitioner's second marriage, his first marriage having terminated in a divorce. On December 19, 1974 the parties entered into a separation agreement which provided that the appellant have custody of the children with visitation rights for the petitioner. Appellant waived alimony and the petitioner agreed to pay child support of $50 per week, per child, in addition to medical and tuition expenses, and to maintain insurance for the children. Appellant was to have possession of the marital home until June 30, 1975, after which the house was to be sold and the proceeds divided equally. On January 9, 1975 petitioner was granted an uncontested divorce on the ground of adultery. The separation agreement survived and was not merged into the judgment. On February 8, 1975 petitioner remarried and, the following month, he and his new wife purchased a home. In the ensuing months the appellant, who was a housewife, sold handcrafts and some of the furniture. She apparently did not co-operate in the sale of the house. In January, 1976 she brought an action to set aside the separation agreement on the ground that she had been deceived and misled by the petitioner and her former attorney. The petitioner ceased paying the mortgage installments, fuel bills and weekly child support payments. He employed his secretary's husband, one Thomas Fitzgerald, to maintain a surveillance of appellant. On February 28, 1976 he persuaded State Troopers O'Connell and Dunning to seek entrance to appellant's home during the early hours of the morning because there was a vehicle with dealer's plates parked in her driveway. When admitted, they found a man, one Mathew McGoey, fully clothed, asleep on the living room sofa. Mr. McGoey testified that he was there at appellant's request because of the petitioner's harassment. On April 21, 1976 petitioner commenced this proceeding, by order to show cause, to obtain custody of the three children. His supporting affidavit, dated March 27, 1976, states that since the divorce the appellant has been promiscuous in her relations with men, that she has become a heavy drinker and reckless driver, that she has been neglectful and physically abusive of the children and that she intends to move out of the jurisdiction. The affidavit of petitioner's wife, Elizabeth, is in agreement. Their affidavits

further state that they are unable to have children for medical reasons while the appellant is able to bear children and has expressed the desire to have more children. Mr. Justice Wood signed an ex parte order awarding temporary custody of the children to the petitioner and directing the Department of Social Services to forthwith remove the children from appellant's custody. When the Sheriff's officers reported that the children did not wish to go to their father, Justice Wood orally permitted the children to remain with their mother overnight and directed all parties to appear before him the next day. When the parties appeared in court on April 23, 1976, appellant's attorney was in the hospital. Appellant informed the court that she had planned to be married that day, that while she planned to move out of the State eventually, her father was recovering from open heart surgery and she would not leave the State until he had recovered and that she had brought her neighbors to court. Justice Wood refused to hear the neighbors and expressed fear that appellant would leave the jurisdiction. After interviewing the children *in camera* without an attorney being present, and after listening to a tape submitted by the petitioner, he awarded temporary custody of the two boys to the petitioner. The affidavits of two physicians, Dr. Philip Holzberger, a general practitioner, and Dr. John Charde, a pediatrician who examined the boys at their father's request, stated that Peter was recovering from chicken pox with complications of bronchitis and otitis. Dr. Charde stated that there were "evidences of resolving contusions [on Peter's back and the back of his legs] suspicious of the child being traumatized * * * expecially in light of the history related by the father." The doctors' affidavits were written on the petitioner's stationery and Dr. Holzberger's affidavit was notarized by the petitioner. Appellant married Thomas McCarthy, her present husband, on April 26, 1976. Her opposing affidavit denied all of the petitioner's accusations in detail. She stated that the petitioner drinks and gambles heavily, that he did not visit the children for four months and that the house would have been without heat and the children without food had it not been for her father and her new husband. She charged that Elizabeth Braiman has a vicious temper and has hit Peter on numerous occasions. She said that the children's teachers and her neighbors could testify as to her fitness to care for the children. In her opposing affirmation, appellant's counsel stated that appellant's home was neat and clean and that appellant was an able and diligent homemaker. She called the court's attention to the fact that the petitioner had married his present wife less than two months after the separation agreement was executed and one month after he obtained the divorce. She informed the court of appellant's pending action to vacate the separation agreement. On April 27 the parties again appeared before Mr. Justice Wood and the aforesaid affidavits were given to the court. Petitioner stated that appellant had informed David Craw, the principal of the elementary school attended by Jason and Lynne, that she was moving to another State and that she had arranged with the principal to withdraw the children from school. Mr. Craw was present in court at the appellant's request, but the court denied her application for an immediate hearing because of the pressure of other matters. He continued temporary custody of the two boys with the petitioner, but left Lynne with the appellant because Lynne told him that the petitioner had forced her to make a tape stating that her mother had a parade of men going in and out of the house, by threatening her with a knife. He granted the case a special preference and denied visitation to the appellant pending the hearing. The complaint of child abuse made by Dr. Holzberger was investigated by the Department of

Social Services, which determined that the report was unfounded. The parties consented that the Department of Probation conduct an investigation which could be taken into consideration by the court in its determination on the issue of custody. After an extensive investigation, the probation department worker recommended that Lynne remain with her mother, but was unable to make a recommendation as to the boys. She found that both parties appeared to be genuinely concerned over the children's well-being and that a number of the statements made by the persons she interviewed were in sharp conflict. She noted that Ruth Williams, the investigator for the Department of Social Services, informed her that she would not have removed the children from the appellant on the above complaint of Dr. Holzberger, that the children's teachers at the nursery and elementary schools, the school principal, and the children's pediatrician, Dr. Robert Benson Lerrick, all agreed that the children had been well cared for by the appellant, the only negative factor being excessive absences from school. She reported the statement by Lynne's teacher that "Since her brothers left home, she is prone to uncontrollable crying spells in the classroom, and nervousness" and the statement of Peter's nursery school teacher that their mother was "very warm with him" and that it "was fun to see her with them, and to see them as a family." The plenary hearing began on June 1, 1976 before Mr. Justice Jiudice and continued for eight days. He denied appellant's application for supervised visitation with the boys pending his decision. By order dated July 6, 1976, he awarded custody of the two boys to their father and custody of the daughter to her mother. He assigned three major reasons for his decision: (1) medical testimony that the boys were in poor physical and emotional condition when the petitioner obtained temporary custody, and in good physical and stable emotional condition at the time of the hearing; (2) medical and psychiatric opinions that it would not be in the best interests of the boys to be in their mother's custody "at this time"; and (3) his conclusion that the boys had adjusted better to their father's household in a few weeks than they had to their mother's in more than a year. He noted that the school records of two of the children show "an unusually high rate of absences" and commented: "Since the divorce, it appears the [appellant] has searched for happiness and companionship and has allowed her self-interests to predominate over the welfare of her children. In a little over one year since the divorce she has had three proposals of marriage and accepted a fourth." He granted the mother visitation rights with the boys, and the father visitation rights with the daughter, on the second Saturday of each month between the hours of 10:00 A.M. and 8:00 P.M. He denied the mother's subsequent applications for counsel fees at Special Term and on this appeal. On appeal, the appellant's statement that she has not seen her two sons since the father was awarded temporary custody in April, 1976, as the father has not permitted visitation, is not disputed. To justify a modification of the custodial arrangements which the parties themselves had determined was best for these young children, a change of circumstances is required, especially with respect to the crucial matter of fitness (see *Matter of Ebert v Ebert,* 38 NY2d 700). Disparity between the creature comforts and amenities which living with the father would bring, and those lesser ones provided by the mother, or improved economic conditions on the part of the noncustodial parent, does not create a foundation for the petition to change custody *(Matter of Ebert v Ebert, supra; La Veglia v La Veglia,* 54 AD2d 727). The separation of siblings is to be frowned upon unless special circumstances related to the best interests of the children require such separation. There is no claim

that, when she was first given the children, appellant was not fit for the custodial role which both parents apparently thought it best she assume. The change in circumstances which would justify a transfer of custody must be a showing that appellant is an unfit custodial parent or that harm to the boys would result if they remained in her custody (see *La Veglia v La Veglia, supra*). The proof offered at the hearing did not meet these requirements. Five physicians testified, three on behalf of the petitioner and two for the appellant. Dr. Holzberger, a general practitioner, testified on behalf of petitioner that he saw the boys with their father for the first time on April 25, 1976. He found Jason basically healthy, except for a soreness around the mouth, peeling skin on his feet and toenails which needed to be clipped. He found Peter recuperating from chicken pox with complications. Peter had a bruise on his jaw and contusions on the backs of his legs. He concluded that they were anxious children and filed a report of child abuse. When he saw the boys again on June 2, this time with their stepmother, he found them to be healthy and happy. Although he had never met their mother, he concluded that they were "patently better off with their father" and recommended no visitation by their mother (a rather extreme recommendation). Dr. Charde testified on behalf of petitioner that on April 25, 1976 Peter had six bruises, varying from one to three centimeters, on his lower back and legs. They were a week to 10 days old. Peter told him that if he would be bad, he would be hit by his sister, brother, mother or Tom (his mother's present husband). Although the doctor did not see the mother or the other two children, and using only the history given him by the father, he concluded that the children had apparently not had the best of care. He could give no opinion as to their ultimate care. Dr. Arnold Bucove, a psychiatrist testifying on behalf of petitioner, had examined the two boys. His examination consisted of a half-hour interview with the stepmother and a 20-minute talk with each of the boys, during which they told him they never wanted to see their mother again. He, too, had not met the mother. His opinion was that the interests of the children would be best served by their father and he recommended no visitation with their mother for a minimum period of two years (another rather extreme recommendation). Dr. Robert Benson Lerrick, the pediatrician who had been treating the daughter since 1968 and the two boys since they were born, was called by the appellant. He testified that he has a middle class practice and that the children always appeared average in cleanliness, were dressed neatly and appropriately for the time of year and that their behavior was average. He never saw any signs of child abuse. He had been treating Jason for asthma since the fall of 1974 and was planning to decrease the treatment gradually and discontinue it at the end of two years. Jason had been moderately symptom-free for almost a year. He never saw Jason with an inflammation around his mouth. He last saw Jason on April 12, 1976, at which time he was suffering from a contagious rash known as Echo Virus Nine, which cannot be caused by dirt or anxiety. He last examined Peter on October 17, 1975. The contusions described as having been present on Peter's back could have come from a fall from a tree. Dr. George Nurnberg, a psychiatrist on the faculty of Cornell University, testified on behalf of appellant that, in his opinion the bruises described on Peter were not indicative of abuse. He could think of no valid medical reason for removing the four- and five-year-old children from their mother, who has had custody of them since birth. He examined the mother and Lynne in court and concluded that the mother did not have the type of personality that leads to the abuse of children. He further testified that separation is extremely traumatic, that one can see the

impact on the daughter and that separating Lynne from her mother would be disastrous for both. The testimony of the pediatrician who had been taking care of the two boys since birth, and who had seen them frequently with their mother, is entitled to more weight than the testimony of medical experts who had never seen the children before this proceeding was commenced, who had never met the mother and who derived all of their information from the father, the stepmother and the four- and five-year-old children, in the midst of a contest for custody. School principal David Craw, Jason's kindergarten teacher Delores Romano, Peter's nursery school teacher Sylvia Frane, a number of appellant's neighbors and a local shopkeeper, all testified at the hearing. They agreed that the children were well cared for by their mother. The only negative comment was that the two older children were absent from school excessively, although not more so than many other children. While the mother went out frequently in the evening, there is no claim that she left the children unattended. The babysitters testified that she always left the number of a telephone at which she could be reached and that she would telephone home. She was active in the children's school as a class mother and in assisting with various projects. She attended church on Sundays with the children. A divorced woman has the right to engage in private sexual activities which do not involve or affect her minor children (*Matter of Feldman v Feldman,* 45 AD2d 320). Further, appellant had married her present husband some six weeks before the hearing. In the absence of proof that she forfeited her right to retain custody, it was error to grant petitioner's application (see *La Veglia v La Veglia,* 54 AD2d 727, *supra*). However, under the particular circumstances of this case, we deem it to be in the best interests of the boys that the parties be awarded joint custody, the boys to be with their mother from Sunday evening through Friday afternoon, and with their father from Friday evening through Sunday afternoon. The boys' holidays and vacations are to be shared equally by the parties as they may agree. If the parties are unable to agree, Special Term shall make the decision. The children are not to be removed from the jurisdiction. The parties should participate in appropriate counseling under Special Term's supervision, to the end that they will co-operate to assure the development and maintenance of the continuing long-term relationships favored by the law and modern pediatric psychology (see *Matter of Ebert v Ebert,* 38 NY2d 700, *supra*). At the conclusion of a six-month period from the date of this order, the parties are to submit to psychiatric evaluations, the results of which are to be reported to Special Term. It was an improvident exercise of discretion to deny the appellant mother counsel fees for the proceedings at Special Term. Appellant's attorney, Joan Goldberg, has received no money from the appellant and has agreed to accept whatever sum the court awards. She has submitted an itemized application for 137 hours of work, including the eight days consumed by the hearing. Appellant is awarded the sum of $6,500 as a counsel fee to cover the proceedings at Special Term, and is further granted leave to reapply to Special Term for a counsel fee as to the appeal. Mollen, P. J., Titone, Rabin and Margett, JJ., concur.