OPINION OF THE COURT
Howard A. Levine, J.
By petition and order to show cause, dated August 25, 1978, the father seeks custody of his two daughters, aged nine and seven. The mother was personally served with the pleadings in Oxford, Mississippi. Thereafter, she appeared in this proceeding, and, pursuant to her request and under the provisions of section 262 of the Family Court Act, counsel was assigned. She has now moved to dismiss this petition on the grounds that under the Uniform Child Custody Jurisdiction Act (Domestic Relations Law, art 5-A, § 575-a et seq.) (hereinafter referred to as the UCCJA) the Family Court of Schenectady County either lacks jurisdiction or should decline to exercise jurisdiction to determine the custody of the children.
Because of some of the factual inquiries required under various jurisdictional provisions of the UCCJA, by stipulation of the parties, a social investigation of both parents was made by appropriate public welfare agencies in Schenectady and Oxford, Mississippi, and psychological evaluation of the children was performed here by a clinical psychologist. The reports of the investigations and evaluation were made available to the attorneys for the parties, the Law Guardian and the court.
Based upon the foregoing reports and the uncontested allegations of the pleadings, it appears the parties were married in 1966 and lived together with the children in Schenectady until they physically separated in 1973. They entered into a formal separation agreement in January, 1974, under which the mother was given custody. The agreement was incorporated but not merged in the divorce decree dissolving the marriage granted in Supreme Court, Schenectady County, in March, 1974. The separation agreement contained a provision under which the mother agreed not to remove the children *348 from Schenectady without the consent of the father. The mother soon remarried a man who was then in the military service and in August, 1974, she sought and received permission to leave Schenectady with the children to accompany her husband to Texas where he was stationed. That marriage was dissolved in 1975 or 1976 and she then moved to the State of Florida. While there she met and married one James P. In January, 1977, she, James P. and the children moved to Mississippi, where he was attending college. The father resumed contact with the children in Florida in January, 1976, and had them with him for mutually agreed upon periods of visitation in Schenectady during the summers of 1976 and 1977. Serious marital difficulties arose between the mother and her husband in the spring of 1978, leading to the initiation of a divorce action by her in May, 1978. Apparently in an effort to avoid exposure of the children to the domestic turmoil and particularly to alleged harassing conduct of James P. toward the mother, the parties agreed that the children would start their visitation earlier than usual, after the school year ended in Oxford in May. The father retained the children and then commenced this proceeding to change legal custody.
JURISDICTION
Under traditional principles applied in custody litigation in New York prior to the enactment of the UCCJA in 1977, this court clearly would have jurisdiction, either because of the physical presence of the children here, or because a New York court had rendered the original determination in the divorce decree in 1974, and retains continuing modification jurisdiction under section 240 of the Domestic Relations Law. (See Nehra v Uhlar, 43 NY2d 242; Matter of Lang v Lang, 9 AD2d 401; Anonymous v Anonymous, 62 Misc 2d 758.) Under the UCCJA (Domestic Relations Law, § 75-d, subd 2), however, physical presence of the child is not alone sufficient to confer jurisdiction. Section 75-d (subd 1, pars [a]-[d]) set forth four specific alternative factual requisites for the exercise of jurisdiction:
"1. A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree only when:
"(a) This state (i) is the home state of the child at the time of commencement of the custody proceeding, or (ii) had been the child’s home state within six months before commence *349 ment of such proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state; or
"(b) it is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (ii) there is within the jurisdiction of the court substantial evidence concerning the child’s present or future care, protection training, and personal relationships; or
"(c) the child is physically present in this state and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child; or
"(d) (i) it appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraph (a), (b), or (c), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.”
The pleadings and the agency reports establish that the children continuously resided in Mississippi from January, 1977 until May, 1978, when they were sent to Schenectady and thereafter retained by the father. The Mississippi welfare agency reported that the mother divorced James P. in August, 1978, and that even before that he refrained from contact with her after she threatened to have him arrested, and indeed, at the time of the investigation his whereabouts were unknown. Local sources of information indicated to the investigator that apart from their exposure to the earlier marital conflict, the children functioned at least adequately while in the care of the mother and that the mother is presently employed and has adequate housing for the children if they were returned to her custody. The psychologist’s report assessed the children as being normal intellectually and as suffering no severe emotional problems.
Therefore, on the basis of the available factual information, the exercise of jurisdiction is not authorized under section 75-d (subd 1, par [a]), since Mississippi, and not New York, is the home State; nor under section 75-d (subd 1, par [c]) since the children were not abandoned and there is not evidence that they need the immediate emergency protection *350 of this court; nor under section 75-d (subd 1, par [d]) since it appears that Mississippi would have jurisdiction as the home State and has not declined to exercise such jurisdiction. Section 75-d (subd 1, par [b]), however, authorizes this court to exercise jurisdiction when "it is in the best interest of the child that a court of this state assume jurisdiction” because the child and at least one contestant have a "significant connection” here and there is "substantial evidence” here concerning the child’s present or future care. Given the general purposes of the UCCJA, expressed in subdivision 1 of section 75-b of the Domestic Relations Law, as well as described in such recent interstate custody cases as Matter of Inn v Inn (93 Misc 2d 1110) and Matter of Anonymous (92 Misc 2d 280), namely, to avoid successive and conflicting assumptions of custody jurisdiction by courts, based merely on physical presence of the child and purportedly required by his best interests, the phrase "best interest” in section 75-d (subd 1, par [b]) should not be applied independently and is insufficient as a jurisdictional basis absent proof of both the "significant connection” and "substantial evidence” requirements. This interpretation conforms to the Commissioners’ Note to the corresponding section of the Uniform Act wherein, in referring to this paragraph, it is stated that "its purpose is to limit jurisdiction rather than to proliferate it.” (9 Uniform Laws Ann, p 108).
Paragraph (b) of subdivision 1 is the least precise of the alternative jurisdictional bases contained in section 75-d. As pointed out in the Commissioners’ Note to the Uniform Act (9 Uniform Laws Ann, p 108), "the paragraph was phrased in general terms in order to be flexible enough to cover many fact situations too diverse to lend themselves to exact description.” Since section 75-d (subd 1, par [d]) permits the court to accept jurisdiction in the best interests of the child when no other State has jurisdiction under the jurisdictional prerequisites of the act, section 75-d (subd 1, par [b]) presupposes that another State’s court may also meet the act’s jurisdictional requirements to hear the case. Moreover, the "significant connection” and "substantial evidence” language is to be contrasted with that of the act’s forum non conveniens provision (Domestic Relations Law, § 75-h) which authorizes a court having jurisdiction to decline to exercise it based on various factors, including whether another State has a "closer connection” with the child and the contestants, and whether substan *351 tial evidence is "more readily available” concerning the child’s present or future care.
From the foregoing, it may be inferred that section 75-d (subd 1, par [b]) permits the courts of this State to exercise jurisdiction over a custody dispute, even when another State’s forum may also satisfy the requirements to determine custody, if there are sufficient legal and factual contacts with the child and his family to justify a legitimate State interest in the outcome of the dispute, and if sufficient evidence is available upon which a court could make a fair and well-founded determination of custody based upon the best interests of the child. Applying these criteria, I find that here the facts support the jurisdictional prerequisites of section 75-d (subd 1, par [b]). The "significant connection” of this State to the dispute consists of (1) the fact that the original decree dissolving the marriage of the parties and awarding custody was made in New York; (2) the residence of one of the parents in New York; and (3) the presence of the children in New York. The "substantial evidence” requirement is also met in that evidence is available here concerning the suitability of one of the contestants, i.e., the father, and concerning the children’s condition and preferences. The most decisive factor is that New York rendered the original custodial decree. The courts of other States where the act has been in effect for some time construe it to retain the principle of continuing jurisdiction unless contact with the child has virtually ceased, and even when another State has become the home State. (See Moore v Moore, 24 Ore App 673; Smith v Superior Ct. of San Mateo County, 68 Cal App 3d 457; Schlumpf v Superior Ct. of County of Trinity, 79 Cal App 3d 892.)[1]
FORUM NON CONVENIENS
Section 75-h of the Domestic Relations Law provides that a court which has jurisdiction to determine custody under the act may nevertheless "decline to exercise its jurisdiction any time before making a decree if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum.” The Commissioners’ Note to the *352 corresponding section of the Uniform Act (9 Uniform Laws Ann, p 114) states that it was intended to encourage judicial restraint in exercising jurisdiction "whenever another state appears to be in a better position to determine custody of a child.” To implement that purpose, subdivision 3 of section 75-h directs that the court take into account five specific factors "among others”, namely, whether "(a) another state is or recently was the child’s home state; (b) another state has a closer connection with the child and his family or with the child and one or more of the contestants; (c) substantial evidence concerning the child’s present or future care * * * is more readily available in another state; (d) the parties have agreed on another forum which is no less appropriate; and (e) the exercise of jurisdiction by a court of this state would contravene any of the purposes stated in section seventy-five-b of this article.” The same Commissioners’ Note further indicates that it was intended as an adaptation of common-law forum non conveniens principles to the particular problems of child custody litigation and was not intended to exclude considerations customarily applied by courts in deciding whether to decline to exercise jurisdiction, such as convenience of the parties and hardship to the defendant.
Discretionary dismissal in any civil action or proceeding on the grounds of inconvenient forum is expressly sanctioned under CPLR 327 and the courts of this State applied common-law principles of forum non conveniens even before the rule was incorporated in the CPLR. As stated in Silver v Great Amer. Ins. Co. (29 NY2d 356, 360), the basic inquiry is whether " 'on balancing the interests and conveniences of the parties and the court, the action could better be adjudicated in another forum.’ ” In leading forum non conveniens cases the factors that have been considered include the extent of hardship to the defendant in defending the action in New York and the availability elsewhere of a forum in which the plaintiff may obtain effective redress (Varkonyi v S. A. Empresa De Viacao Ainea Rio Grandense [Varig], 22 NY2d 333); the relative ease of access to sources of proof, the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing witnesses, and all other practical problems that may make trial of a case easy, expeditious and inexpensive (Hernandez v Cali, Inc., 32 AD2d 192). These criteria are not dissimilar to the questions of home State, comparative connection to the dispute and *353 relative availability of evidence expressly to be considered under subdivision 3 of section 75-h. New York courts have applied the doctrine of inconvenient forum in custody cases prior to the effective date of the UCCJA. (See Anonymous v Anonymous, 62 Misc 2d 758, supra; Gross v Kellerman, 62 AD2d 1149.)
Upon considering all of the foregoing factors, common-law as well as statutory, I have concluded that this court should decline to exercise its jurisdiction to resolve this custody dispute. First, as previously noted, Mississippi and not New York is the home State. Likewise, Mississippi appears to have a "closer connection with the child and his family or with the child and one or more contestants” (Domestic Relations Law, § 75-h, subd 3, par [b]; emphasis supplied). The repetition of "child” is apparently intentional and requires a separate analysis of which State has a closer connection with the infant subjects of the proceeding, apart from its connection with the other participants. This is consistent with the emphasis in the entire statute on encouraging a selection of the forum in the optimum position to determine the best interest of the child. While New York and Mississippi each have roughly equal connections with one parent, New York really has had only cant contact with the children since they left the State -Aortly after the divorce was granted in 1974 — a sum total of three summer visitation periods before the petition was filed. Indeed, but for the fact that the original divorce decree awarding custody to the mother was rendered in New York, the contacts between the children and this State clearly would have been weaker support for this court’s acceptance of jurisdiction under section 75-d. Mississippi, on the other hand, has been the State of continuous residence of the children since January, 1977. It, and not New York, has the primary parens patriae interest, and the more substantial nexus.
To determine in which State the evidence concerning the children’s present or future care is more readily available requires a review of the factual issues raised by the pleadings in the light of applicable legal principles in change of custody cases. The substance of the father’s allegations is that the children have suffered from the instability of their mother and of their life with her, based upon repeated changes of residences, two unsuccessful marriages and particularly the disruptive atmosphere and risk to their safety arising out of the breakup of the mother’s marriage to James P. He also *354 alleges that he now offers a more stable family unit and superior physical surroundings. The mother denies that the children were ever in any danger and affirmatively alleges that they have functioned well at home and in school and were well cared for, and that she has a suitable residence for them to live with her. She does not expressly deny her former husband’s claim of his own fitness. From the foregoing, it is clear that the crucial contested issues of fact raised by the pleadings are concerned with the quality of care exercised by the mother, her stability and the stability of the children’s home life with her and the effect, if any, of these factors on the children. Under New York decisional law, a previous order granting custody to one parent may not be changed absent proof of a change in circumstances demonstrating that the custodial parent is either unfit or less fit than at the time of the original decree. (See Obey v Degling, 37 NY2d 768; Matter of Ebert v Ebert, 38 NY2d 700; Dintruff v McGreevy, 34 NY2d 887; Matter of Feldman v Feldman, 45 AD2d 320.) Research discloses that under Mississippi law, before a custody order may be changed, proof also is required of a change in circumstances, either actually or probably, adversely affecting the child’s welfare. (See O’Neal v Warden, 345 So 2d 610 [Miss]; Pike v Pike, 317 So 2d 897 [Miss]; Brocato v Walker, 220 So 2d 340 [Miss].) Therefore, whether this proceeding is litigated in New York or in Mississippi, the critical inquiry will be concerned with the care, conduct and parental ability of the mother, and whether any deficiencies have had an actually or potentially harmful effect on the welfare of the children. The sources of evidence with respect to these issues are most likely to be located in Mississippi, and not in New York.
The hardship on the mother if compelled to defend this proceeding here, and the availability of an appropriate alternative forum for the father, have also been considered. Either party will suffer some degree of inconvenience and expense if forced to litigate the issue of custody in the State of the other party’s residence. The welfare agency reports submitted to the court lead to the inference, however, that the father is in at least somewhat superior economic circumstances than the mother. It is true that the father has stipulated that in the event that jurisdiction over this proceeding is retained in this court, he will pay for the traveling expenses of the mother to permit her to attend and participate in the trial here. That *355 stipulation, however, could not be construed to extend to the expense entailed in securing the attendance of Mississippi witnesses on the threshold issue of the mother’s fitness and the quality of the children’s lives in Mississippi, and it is precisely those witnesses whose direct oral and demeanor evidence would be of most benefit to the court in making an appropriate decision on custody. Therefore, it appears that the hardship and prejudice to the mother in defending this proceeding in New York would be greater than there would be to the father in prosecuting the proceeding in the appropriate court in Mississippi. In attemping to assess the availability of an alternative forum where the father could obtain substantially equivalent relief, I have heeded the policies enunciated under the act concerning the promotion of interstate co-operation and exchange of information between courts (Domestic Relations Law, § 75-b, subd 1, pars [b], [h]), by addressing an inquiry to the Honorable William H. Anderson, Chancery Judge of Lafayette County, Mississippi, which encompasses Oxford, concerning procedures in custody matters in that court and the condition of its Trial Calendar. His written reply will be annexed to the original copy of this decision and to the copies transmitted to counsel. It indicates that the Chancery Court would have jurisdiction over this proceeding if it were initated in Mississippi; that there are procedures available in the Chancery Court to obtain the testimony of out-of-State witnesses by deposition, and to enter and introduce such depositions in evidence; that this proceeding could be heard at a May 1979 Trial Term commencing on the fourth Monday in May; and that because a trial preference is accorded child custody cases in the court, in the event that the case is not ready for trial at the May Term, it could be heard at a subsequent vacation term. Therefore, a Mississippi forum is readily accessible and available to the father for the trial of this matter under comparable procedural and similar substantive rules. Thus, these additional criteria applied generally when forum non conveniens is in issue also support the conclusion that Mississippi is the more appropriate forum.
Finally, section 75-h requires the court to consider on the question of inconvenient forum whether the exercise of jurisdiction by this court would contravene any of the purposes of the act. Among the purposes outlined in subdivision 1 of section 75-b are included the objectives to "avoid jurisdictional competition and conflict of courts in other states in matters of *356 child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being;” and to "discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child.” The Commissioners’ Prefatory Note to the Uniform Act points out that one of the evils addressed by the statute is the deleterious effect on children of being subjected to repeated disruptions in custodial care when courts of several different States assume the authority to modify previous custody determinations on the basis of the presence of the child within the jurisdiction, as the result of "child snatching” or retention by one parent after a period of visitation, which in turn invokes subsequent resort to reciprocal tactics by the other parent. The particular problem of custodial insecurity in the interstate visitation context existing in the absence of the Uniform Act was noted in an article[2] by the principal draftsman of the Uniform Act: "A child who visits a noncustodial parent in a state not governed by the Act cannot be certain of returning home, for a court of the visited state may transfer custody. This very real possibility places 'a premium on the abuse of the right of visitation and make[s] it difficult for parties to agree on the free movement of the child from one parent to the other.’ The Uniform Act eliminates the incentive for such practices.”[3]
The security and stability of the free interstate movement of the children in this case between their parents for purposes of visitation will not be promoted if this court exercises jurisdiction, particularly if the father is successful in gaining his objective of a change in custody. In such an event, since there is nothing whatsoever in the record thus far to contraindicate it, in all likelihood visitation rights would be granted the mother. Mississippi, according to the advice of Chancery Judge Anderson, has not enacted the UCCJA. Therefore, if visitation at the mother’s home were ordered and took place, under the customary jurisdictional principles previously discussed, there would be nothing to prevent a Mississippi court from entertaining an application to reopen the issue of custody. And each successive scheduled visit would be preceded *357 by the anxiety of both custodial parent and children that it will be the occasion for retention of the children and a resort to the Mississippi courts to once again change custody. Moreover, given the apparent financial circumstances of the mother, there are no conditions which this court could impose to prevent that threat, such as requiring that visitation take place in New York or that she post security, which would not have the concomitant effect of terminating or at the least drastically curtailing contact between mother and daughters.
It needs no elaborate explanation to demonstrate that the risks of abuse of interstate visitation rights are drastically reduced if this custody application is decided by the Mississippi courts, whichever party ultimately succeeds. If custody is retained in the mother, she will have reasonable assurance of this court’s adherence to its decision not to exercise custody jurisdiction during a visitation in New York. On the other hand, if custody is awarded to the father by the Mississippi court, on a subsequent visitation in that State, he can place additional reliance on the Mississippi courts’ enunciated policy against modification of their previous custody decrees except upon a strong showing of a change in circumstances adversely affecting the children’s welfare.
For all the foregoing reasons, I have concluded that this court should decline to exercise jurisdiction over this proceeding on the ground that it is an inconvenient forum under section 75-h, and should stay further proceedings on various conditions which will be set forth below. This determination conforms to the prevailing case law in other States which have enacted the Uniform Act, where courts have declined to exercise their continuing jurisdiction over their own prior custody decrees when the custodial parent has moved to another State with the children and the children are present in the original State for visitation only. (See Kern v Kern, 87 Cal App 3d —, 5 Family Law Reporter 2170 [Dec. 18, 1978]; Moore v Moore, 24 Ore App 673, supra; Clark v Superior Ct. of County of Mendocino, 73 Cal App 3d 298; Schulumpf v Superior Ct. of County of Trinity, 79 Cal App 3d 892, supra; Turley v Griffin, 508 SW2d 764 [Ky].)
RETROACTIVITY
Although not raised by the parties, some reference to the issue of retroactivity may be required because of the recent decision in Pitrowski v Pitrowski (97 Misc 2d 755). There the *358 court held that the UCCJA could not be applied to an already pending custody proceeding in order to validate jurisdiction nonexistent before the act’s effective date, on a theory of relation back. Pitrówski is readily distinguishable even though the instant proceeding was commenced some six days before the effective date of the UCCJA. As previously discussed, the jurisdictional issue would be resolved the same whether before or after the enactment of the UCCJA. The determinative issue of forum non conveniens under section 75-h, however, deals with a discretionary procedural device to limit, not expand, the exercise of jurisdiction by the court, in deference to a more appropriate out-of-State tribunal. The general rule is that a new procedural statute will be applied in already pending actions to any procedural steps taking place subsequent to the act’s effective date, in the absence of clear contrary legislative intent (see McKinney’s Cons Laws of NY, Book 1, Statutes, § 55). Even in instances of substantive statutory changes in child welfare related matters, the law "as it exists today” has been applied to cases pending before the new enactment. (Matter of Ray A. M., 37 NY2d 619, 622.) Moreover, well before the effective date of the UCCJA it has been repeatedly held that the policies of the act reflect the recent common law of New York. (See Nehra v Uhlar, 43 NY2d 242, 249-251, supra; Martin v Martin, 45 NY2d 739, 742; Gross v Kellerman, 62 AD2d 1151, supra; Matter of Anonymous, 92 Misc 2d 283, supra; Matter of Inn v Inn, 93 Misc 2d 1115, supra.) And, as previously discussed, forum non conveniens has been a part of New York procedural law long before the enactment of the UCCJA, and its principles have been applied by New York courts to decline jurisdiction in interstate custody matters either expressly or under the doctrine of comity (Matter of Lang v Lang, 9 AD2d 401, supra). In short, no impermissible retroactive effect is being given to the UCCJA by dismissal here on the basis of inconvenient forum, either because such dismissal merely involves the application of a procedural statute to an already pending case, or because the UCCJA substantially reflects the law existing before its effective date.
For the foregoing reasons, the instant proceeding is stayed on the following conditions:
1. That the mother stipulate her consent and submission to the jurisdiction of the Chancery Court of Lafayette County, *359 Mississippi, in any proceeding brought by the father for the same or similar relief.
2. That the mother further stipulate that in any such proceeding, the report of caseworker K. M. Gill of the Child Welfare Division of the Schenectady County Department of Social Services and the reports of Dr. Thomas Di Ciurcio, previously submitted to this court, may be admitted into evidence, subject to the right of either party to take the testimony of the authors of the reports in Schenectady by oral depositions, which depositions shall also be admissible in evidence.
This court will retain jurisdiction to direct and supervise the return of the children to the custody of their mother which will take place not later than June 23, 1979, the approximate date of the end of the school year, and may take place earlier upon application of either party or at the request of the Chancery Court of Lafayette County, Mississippi, if their presence is deemed necessary in connection with any pending custody proceeding in that court. Upon satisfactory showing of compliance with the foregoing conditions, and the return of the children to their mother, this proceeding will be dismissed.

. It should be noted that since there was a previous custody decree by a New York court, the provisions of subdivisions 1 and 2 of section 75-i which may bar jurisdiction because of the wrongful conduct of the petitioner, do not apply to the instant case, by their express terms.

. Bodenheimer, Progress Under the Uniform Child Custody Jurisdiction Act and Remaining Problems: Punitive Decrees, Joint Custody, and Excessive Modifications, 65 Cal L Rev 978.

. Id., pp 985-986.